2014 UT App 229

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ROBERT TERRAZAS,
Defendant and Appellant.

Opinion
No. 20130100-CA
Filed September 25, 2014

Second District Court, Ogden Department
The Honorable W. Brent West
Nos. 111901370, 111901701, 111901702, 111901703, 111902690

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE PAMELA T. GREENWOOD
concurred.[1]

ROTH, Judge:

¶1    Robert Terrazas appeals from the district court's decision
to impose ten previously stayed prison sentences after the court
determined that he had not complied with the terms of a
cooperation agreement. Terrazas asserts that the court erred in
treating a violation of the cooperation agreement like a breach of

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah R.
Jud. Admin. 11-201(6).

a plea agreement, which merely requires noncompliance, instead of like a violation of probation, which requires specific sorts of notice and a finding of willful noncompliance prior to revocation. Terrazas also asserts that the court erred in finding him in breach of the cooperation agreement. He argues that the agreement either was unenforceable or, alternatively, was satisfied through his good faith efforts to comply. We affirm.

BACKGROUND

¶2      In 2011, the State charged Terrazas with a variety of offenses in five separate cases, including multiple felony and misdemeanor drug offenses, a felony weapons-restriction violation, a felony resisting arrest offense, and several misdemeanor driving violations. In March 2012, Terrazas entered guilty pleas to four counts charged in one of the cases. The State then began plea negotiations with Terrazas on the four other cases because it believed that Terrazas, as a founding member of the Ogden Trece gang, could help prosecutors develop cases against the gang's leadership. As a result of the negotiations, Terrazas agreed to plead guilty to six felonies and enter a cooperation agreement with the State in exchange for the State dismissing the remaining misdemeanor counts and recommending a suspension of Terrazas's prison sentences in favor of probation if he complied with the cooperation agreement.

¶3      The cooperation agreement required Terrazas to lead the State to information that would allow it to prosecute three identified high-ranking members of the Ogden Trece gang who were involved in drug and firearms trafficking. Terrazas's primary task was to arrange meetings to buy controlled substances from each of these three individuals under circumstances monitored and controlled by the Ogden Metro Gang Unit. During the course of his performance under the agreement, he was required to maintain daily contact with the gang unit. The bulk of Terrazas's cooperation was to occur before June 11, 2012; however, the agreement provided for an

extension of the time for Terrazas to comply so long as "a good faith effort ha[d] been made." If Terrazas successfully performed, the State would recommend that his prison terms be converted to probation and, for his protection, would arrange for Terrazas to serve that probation in another state. If Terrazas "fail[ed] to complete the terms of this agreement," the agreement would "become null and void" and the State would "proceed [with] the pending charges for sentencing."

¶4    In May 2012, attorneys for the State and for Terrazas informed the district court that they had entered into a plea agreement that included a cooperation component. In order to ensure that the stated goals could be met, the terms of the cooperation agreement were to be kept strictly confidential, even from the court; only the prosecutor, the Ogden Metro Gang Unit detective assigned to Terrazas (the Detective), and Terrazas and his attorney were privy to the agreement. The district court accepted the plea agreement on the "good faith" of the parties that "[Terrazas] would go out and comply with the terms of the [plea] agreement."[2] In accordance with the agreement, the court accepted Terrazas's guilty pleas to six felonies and sentenced him to the statutory indeterminate prison terms for each offense to run concurrently. The court also sentenced Terrazas on the four offenses he had previously pleaded to and ran those sentences concurrently with the sentences imposed on the six felonies. The court then stayed execution of the prison sentences for a period of three months to allow the parties to perform the activities contemplated by the cooperation agreement. The court scheduled a hearing for August 8, 2012, to review Terrazas's performance under the agreement. Terrazas was then released from custody.

---

2. The district court was aware that in a separate case Terrazas had "agreed to help law enforcement in the investigation of other individuals" by wearing a wire in return for being released from custody and that after his release, Terrazas failed to contact law enforcement officers and simply disappeared.

¶5    For the first month after his release, Terrazas complied with the terms of the cooperation agreement. He maintained daily contact with the Detective and attempted to set up controlled buys. Then, he started "missing one day here, two days, and it finally got to three days, then actually there was one point, where there was a week he didn't call." Terrazas also failed to follow through with the promised controlled buys: he either set up drug buys with individuals who were not targets identified in the agreement or set up buys with legitimate targets without providing the police with enough lead time or information to monitor the transactions. The Detective also began to receive calls from officers in other jurisdictions who had observed Terrazas selling drugs outside the controlled buys that he was to set up under the agreement. Most of the time, the Detective intervened to prevent Terrazas's arrest in order to allow him to continue working with the gang unit. But in late July 2012, the Detective did not intervene, and an agent with the Weber Morgan Narcotics Strike Force arrested Terrazas for selling methamphetamine.

¶6    After several continuances, Terrazas ultimately appeared before the district court for the contemplated sentence review hearing in January 2013. The State produced an unsigned copy of the cooperation agreement as evidence of its terms. The prosecutor who negotiated the cooperation agreement[3] and the Detective each testified about the terms of the agreement and about what they saw as Terrazas's noncompliance. Terrazas also testified in his own behalf. Terrazas testified that he had signed a cooperation agreement with terms similar to those in the copy the State produced but that in the original, signed agreement, the signatures were on a separate, unproduced addendum that also listed the names of the three targeted individuals and contained a stipulation that the State would consider the agreement fulfilled if Terrazas, with the State's consent, attained

---

3. By the time of the review hearing, a new prosecutor had been assigned to the case.

prosecutable information against acceptable substitutes. Terrazas explained that he attempted to set up several controlled buys with the target individuals but that the police changed the appointments "[t]wo or three times" because "the officers couldn't be there." He testified that he had also helped the officers to arrest two fugitives (though not the target individuals) in late June, and that he had been told that this assistance would at least buy him some extra time to comply.

¶7     After considering the evidence at the hearing, the district court found that although Terrazas had made some minimal effort, Terrazas did not fulfill his commitment to help the police obtain information against three identified leaders of the Ogden Trece gang. The court therefore found Terrazas to be "in violation of this agreement." As a consequence, the court lifted the stay and imposed the prison sentences.[4] Terrazas now appeals.

ISSUES AND STANDARDS OF REVIEW

¶8     Terrazas asserts that the district court lifted the stay and imposed the sentences without providing him with the "[m]inimum [g]uarantees of Due Process." The district court's handling of "[c]onstitutional issues, including questions

_____

4. The district court also determined that Terrazas was in breach of the cooperation agreement because he was "still out there selling drugs." Terrazas argues that the court could not fault him for engaging in this conduct because the circumstances of the cooperation agreement required him to keep up a facade that he was still in the business in order to access the targeted individuals and because the Detective had encouraged him to do what he needed to do to get to the targets. We need not reach this contention because we conclude that Terrazas's failure to obtain prosecutable information against the targeted individuals independently violated the cooperation agreement.

regarding due process, are questions of law that we review for correctness." *State v. Turner*, 2012 UT App 189, ¶ 15, 283 P.3d 527 (citation and internal quotation marks omitted). Specifically, Terrazas argues that the court ought to have treated the cooperation agreement like a probation agreement, which would permit the court to revoke the cooperation agreement and impose the prison sentences only if it followed the notice and procedural requirements of Utah Code section 77-18-1 and found any violation of the terms of the agreement to be willful.[5] *See* Utah Code Ann. § 77-18-1(12) (LexisNexis 2012) (explaining the requirements for revoking probation);[6] *see also State v. Hodges*, 798 P.2d 270, 277 (Utah Ct. App. 1990). The State counters that the cooperation agreement should be treated like a plea agreement, which requires only that the court look at the agreement's material terms to determine whether Terrazas had complied. The court's decision to treat the cooperation agreement like a plea agreement rather than probation presents an issue of law, which we review for correctness. *See Turner*, 2012 UT App 189, ¶ 15 (explaining that we review issues regarding due process as questions of law); *State v. Masciantonio*, 850 P.2d 492, 493 (Utah Ct. App. 1993) (explaining that we review a district court's statutory interpretation for correctness).

¶9     Terrazas also asserts that the district court erred in finding him in breach of the cooperation agreement because the agreement is ambiguous and amounts to a contract of adhesion that should be interpreted against the State, its drafter. Whether

---

5. Terrazas also cites the alternative finding that can support a revocation of probation—"if not willful, [the violation] must presently threaten the safety of society." *See State v. Hodges*, 798 P.2d 270, 277 (Utah Ct. App. 1990). All of his arguments, however, relate to willfulness.

6. The applicable statutory provisions have not been substantively amended, and we therefore cite the current version of the Utah Code for the convenience of the reader.

a contract is ambiguous is a question of law. *State v. Patience*, 944 P.2d 381, 387 (Utah Ct. App. 1997) (noting that contract principles of interpretation are useful frameworks for analyzing plea agreements); *see also WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1159 (explaining that whether an ambiguity exists in a contract is a question of law). Absent ambiguity, the interpretation of a contract is also a question of law. *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 13, 266 P.3d 671 (explaining that the interpretation of an unambiguous contract presents a question of law). We therefore review the district court's interpretation of the agreement for correctness.

ANALYSIS

I. The Cooperation Agreement Was Not a Form of Probation.

¶10 Terrazas contends that the district court erred in lifting the stay on his prison sentences because he was not given "specific notice of the allegations against him prior to" the review hearing and because the district court did not enter a finding that Terrazas's noncompliance was willful. In making these arguments, Terrazas takes the position that the review hearing to determine whether to lift the stay of sentence imposed as part of his cooperation agreement was the equivalent of a probation revocation proceeding. The State counters that because Terrazas was "never placed on probation" and "a cooperation agreement is analytically distinct from probation," "application of probation law" is not justified. Rather, the State contends, "cooperation agreements are contractual and are generally reviewed using the same analysis applicable to plea agreements."

¶11 Utah courts have not yet considered whether cooperation agreements are more analogous to probation or to plea agreements. However, in resolving this question, we are guided by the definitions and procedures provided by the probation statute. The Utah Code defines "'[p]robation'" as "an act of grace

by the court" that involves "suspending the imposition or execution of a convicted offender's sentence" and placing the defendant on probation with "prescribed conditions." Utah Code Ann. § 77-27-1(14) (LexisNexis Supp. 2013); *see also id.* § 77-18-1(2)(a) (LexisNexis 2012) ("On a plea of guilty . . . , the court may, after imposing sentence, suspend the execution of the sentence and place the defendant on probation."). Suspension of the sentence in favor of probation results in an agreement between the convicted defendant and the sentencing court in which the defendant agrees "to comply with the conditions of probation as established by that court in exchange for not having to serve a prison sentence." *Rawlings v. Holden*, 869 P.2d 958, 961 (Utah Ct. App. 1994).

¶12　Terrazas argues that this is what happened here—the district court suspended the execution of his prison sentences in return for his agreement to fulfill certain conditions set out in the cooperation agreement, in effect a form of probation. But in this case, the district court engaged in none of the formalities necessary to change Terrazas's status from a defendant sentenced to prison to that of a probationer. After Terrazas entered his guilty pleas, the court imposed the sentences but then stayed execution of those sentences for a period of time in which Terrazas could work to comply with the cooperation agreement so that he could earn the opportunity to be placed on probation. The court did not suspend the sentences as it must when it places a defendant on probation but, in essence, made compliance with the cooperation agreement a condition precedent to probation and not a term of a probationary period already imposed. *See* Utah Code Ann. § 77-18-1(2)(a); *cf. McArthur v. State Farm Auto. Ins. Co.*, 2012 UT 22, ¶ 29, 274 P.3d 981 (explaining that "conditions precedent" are "event[s], not certain to occur, which must occur . . . before performance of a contract becomes due" (omission in original) (citation and internal quotation marks omitted)). Moreover, the district court did not accept compliance with the terms of the cooperation

agreement as a substitute for serving the prison sentences, which is the essence of a probation determination.[7] *See Rawlings*, 869 P.2d at 961. Rather, it set the case for review, at which time it would consider whether to suspend the prison sentences previously imposed in favor of probation or to simply lift the stay so as to begin the running of those prison sentences. In other words, at the time the court accepted Terrazas's pleas, it sentenced him to prison; the cooperation agreement gave Terrazas a way to change those sentences to probation by complying with its terms, and the court stayed execution of the prison sentences to allow Terrazas an opportunity to perform.

¶13    Thus, by releasing Terrazas from custody so he could undertake his obligations under the cooperation agreement, the court did nothing that appears to equate to probation as contemplated by the probation statute; rather, the court's actions seem much more consistent with facilitating the implementation of a plea agreement. A plea agreement is "an agreement entered between the prosecution and defendant setting forth the special terms and conditions and criminal charges upon which the defendant will enter a plea of guilty or no contest." Utah Code Ann. § 77-38a-102.

¶14    Appellate courts in several federal jurisdictions and at least one other state have treated cooperation agreements like plea agreements, not as a kind of probation. *See, e.g.*, *United States v. Tarbell*, 728 F.3d 122, 127 (2d Cir. 2013) (interpreting "plain terms of the confidential cooperation agreement" in the same manner as it would a plea agreement); *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir. 1994) ("A cooperation agreement is analogous to a plea bargain agreement."); *United*

---

7. The district court itself was not even aware of the terms of the cooperation agreement. Thus, the court did not set forth any "prescribed conditions" of "probation" as is typically the case. *See* Utah Code Ann. § 77-27-1(14) (LexisNexis Supp. 2013); *Rawlings v. Holden*, 869 P.2d 958, 961 (Utah Ct. App. 1994).

*States v. Pinter*, 971 F.2d 554, 557 (10th Cir. 1992) (per curiam) (same as *Carrillo*); *United States v. Johnson*, 861 F.2d 510, 512 (8th Cir. 1988) ("A cooperation agreement is somewhat analogous to a plea agreement . . . ."); *State v. Bergmann*, 600 N.W.2d 311, 314 (Iowa 1999) (explaining that when a defendant complies with a cooperation agreement, he is entitled to have it enforced "in the same manner as a plea agreement").[8] The Tenth Circuit Court of Appeals has explained the basis for this approach:

> Cooperation agreements, like plea agreements, function as an essential part of the criminal justice process and are highly desirable as a means to assist law enforcement investigative efforts. Many plea agreements require some cooperation by defendants in ongoing investigations. Additionally, cooperation agreements . . . often result in the surrender of valuable constitutional rights.

---

8. In his reply brief, Terrazas cites *State v. Schwab*, 404 N.W.2d 284 (Minn. Ct. App. 1987), in support of his contention that "courts frequently treat a probation revocation hearing and a violation of conditions as part of a stay as synonymous." In *Schwab*, however, the sentencing court stayed the imposition of sentence because it put the defendant on probation. *Id.* at 284–85. Although we have noted that, in Utah, courts *suspend* sentences in favor of probation, we do not believe the semantics of the Minnesota case suffice to make out Terrazas's claim. The *Schwab* case clearly indicates that the sentencing court formally placed the defendant on probation and that the probation revocation proceeding took place because the defendant was on probation, not because the sentences were stayed for a non-probationary purpose. *Id.* Thus, *Schwab* does not support Terrazas's claim that a cooperation agreement is analogous to probation. And our own research has not revealed any cases that have treated cooperation agreements as anything other than analogous to a plea agreement or as a species of a plea bargain.

> In light of these considerations, we hold that [a] cooperation agreement is analogous to a plea bargain[,] and therefore that the same analysis applies to both types of agreements. Thus, promises in cooperation agreements, whether directly or indirectly made, must be fulfilled to their fullest extent in furtherance of fair and proper administration of justice.

*Pinter*, 971 F.2d at 557 (alterations in original) (citations and internal quotation marks omitted).

¶15    We agree with the Tenth Circuit's reasoning. Cooperation by a defendant is a common component of a particular kind of plea bargain (like this one), in which the State makes promises, such as to reduce the charges (either in severity or number), decline prosecution on a particular charge, or recommend leniency in sentencing, if the defendant cooperates with a law enforcement investigation. Like a pure plea agreement, cooperation agreements provide benefits to both the State and the defendant: the government avoids the expenses associated with proving each charge while still securing convictions against this particular defendant and possibly obtaining information to aid it in prosecuting others; the defendant avoids the burdens of trial and has more control over the outcome of the charges. Because the purposes of a plea agreement and a cooperation agreement often overlap in significant ways, it stands to reason that they should be treated analogously when a dispute arises about what is required or whether the defendant has fulfilled his end of the agreement. For these reasons, we reject Terrazas's claim that the district court placed him on probation when it stayed the sentences while he performed on the cooperation agreement. We now address Terrazas's contention that the statutory provisions for revoking probation nonetheless govern the review hearing.

## II. The Statutory Requirements for Probation Revocation Do Not Apply Here.

¶16 Terrazas contends that procedural and substantive due process require district courts to follow the process specified in the probation statute and then to apply a standard of willfulness when determining whether a defendant violated a cooperation agreement. *See* Utah Code Ann. § 77-18-1(12)(b)(ii), (c)(i), (c)(iii)–(iv), (d) (LexisNexis 2012) (requiring a probationer to be served at least five days before the revocation hearing with an order to show cause informing him of the alleged violations and providing the probationer with the right to counsel, the right to present evidence, and an opportunity to confront the state's witnesses at the hearing); *State v. Peterson*, 869 P.2d 989, 991 (Utah Ct. App. 1994) (requiring a court to "determine by a preponderance of the evidence that the violation was willful" before revoking probation). Because we have concluded that the stay of sentence in connection with the cooperation agreement was not equivalent to putting Terrazas on probation, we conclude that he was not entitled to the benefit of the statutory process or the willfulness standard applicable to probation revocation proceedings.

### A.   Due Process

¶17 Even though we have concluded that the probation statute is inapplicable, Terrazas is still entitled to due process protection. *See* U.S. Const. amend. XIV, § 1 (prohibiting the "depriv[ation of] any person of life, liberty, or property, without due process of law"); Utah Const. art. 1, § 7 (same). "Due process is flexible and calls for the procedural protections that the given situation demands." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993) (citation and internal quotation marks omitted); *see also State v. Orr*, 2005 UT 92, ¶ 11, 127 P.3d 1213 ("What constitutes due process, however, depends upon the type of proceeding and, more specifically, 'the nature of the individual interest affected, the extent to which it is affected, . . . [and] the existence of alternative means for effectuating the purpose.'" (alteration in original) (quoting *Bearden v. Georgia*, 461

U.S. 660, 666–67 (1983))). "Procedural due process requires, [a]t a minimum, timely and adequate notice *and an opportunity to be heard in a meaningful way.*" *State v. Ferretti*, 2011 UT App 321, ¶ 12, 263 P.3d 553 (alteration in original) (citation and internal quotation marks omitted). If a defendant has an "opportunity to present evidence and argument on [an] issue before decision," then he has had an opportunity to be heard in a meaningful way. *Id.* (alteration in original) (citation and internal quotation marks omitted).

¶18    We conclude that Terrazas received due process under the circumstances. The district court informed Terrazas in May 2012 that it was "imposing sentence" but would stay execution of that sentence until a review hearing in August 2012. At that point, if "things go successful[ly]," the court would "consider converting [the sentence] to probation." Terrazas was informed that he would have to come before the court at that hearing to "see where we are" on compliance with the cooperation agreement and whether a recommendation for probation would be made. Terrazas was therefore notified months in advance of the eventual review hearing, at which he appeared and was represented by counsel and had an opportunity to cross-examine the State's five witnesses—including the prosecutor with whom Terrazas negotiated the plea agreement and the Detective who monitored his cooperation. Terrazas also testified in his own behalf, presenting his theory of the cooperation agreement's terms and describing his efforts to comply. Thus, because Terrazas had adequate notice and a meaningful opportunity to be heard, there was no violation of due process in connection with the district court's decision to lift the stay on execution of the prison sentences after the review hearing.

B.    The Willfulness Standard

¶19    Further, because the cooperation agreement is not equivalent to a term of probation, the willfulness standard's requirement of an absence of bona fide efforts to comply does not apply to a determination of whether Terrazas complied with the agreement's terms. *See generally Peterson*, 869 P.2d at 991

("[F]or a trial court to revoke probation based on a probation violation, the court must determine by a preponderance of the evidence that the violation was willful," meaning "the probationer did not make bona fide efforts to meet the conditions of his probation." (citation and internal quotation marks omitted)). Rather, the question of whether Terrazas complied with the cooperation agreement must be considered using the standards of compliance contemplated by the terms of the agreement itself. *Cf. State v. Davis*, 2011 UT App 74, ¶ 3 & n.2, 272 P.3d 745 (interpreting a plea agreement according to its plain terms). We will address that question as part of our examination of the district court's decision that Terrazas failed to perform under the cooperation agreement.

### III. The District Court's Decision that Terrazas Failed To Perform Under the Cooperation Agreement Is Supported by the Agreement's Terms and the Evidence.

¶20    Terrazas makes two alternative arguments to support his position that the district court erred in finding that he breached the cooperation agreement. First, he argues that the agreement itself was unenforceable because (1) the State failed to produce a complete and signed copy of the cooperation agreement at the review hearing; (2) the agreement contained ambiguous and sometimes contradictory terms; and (3) the agreement conditioned his compliance on the State's performance of its own obligations, which Terrazas asserts the State failed to fulfill. Alternatively, he asserts that the agreement requires only good faith efforts to comply, efforts which the district court found that he had made.

¶21    We conclude that the cooperation agreement was enforceable despite the State's failure to produce a complete, signed copy of the agreement. We also conclude that the district court did not err in determining that the cooperation agreement unambiguously required Terrazas to fulfill the contract, not simply to make good faith efforts. Finally, we reject Terrazas's contention that the State substantially hindered his performance.

Accordingly, we affirm the district court's decision that Terrazas failed to fulfill his obligations under the agreement.

A.    The Unsigned, Incomplete Copy of the Cooperation Agreement

¶22    Terrazas first claims that there was inadequate evidence of a cooperation agreement enforceable against him because the State only produced an unsigned, incomplete copy of a purported cooperation agreement to the district court. Terrazas argues that the State's failure to produce the signed cooperation agreement "was important because the parties did not agree that the unsigned copy accurately reflected the signed agreement." Although this argument seems to implicate the best evidence rule,[9] Terrazas has only addressed it as a denial of due process. Specifically, he asserts that through the State's failure to produce a complete copy of the agreement, he was not afforded the opportunity to "claim [that] he fully complied with [the] agreement."

---

9. For example, Terrazas asserts that "the unsigned agreement the State proffered" at the review hearing was "never clarified on the record" as "a copy of the agreement the parties entered into," and in support, he cites a portion of the review hearing transcript that contains what appears to be a best evidence-type argument regarding the State's failure to produce the addendum. His trial counsel argued,

> First of all, your honor, [the prosecutor handling the review hearing, is] in no position to testify about what was in or not in the contract. We had witnesses for that and we don't have the contract. We have an unsigned document that purports to be the contract. We don't have the addendum at all and [the prosecutor], I don't think, has ever seen it. I haven't.

¶23    At the review hearing, Terrazas notified the district court that the original cooperation agreement had an addendum that was not part of the copy of the agreement that the State produced in court. Terrazas argued that the missing addendum contained his signature and the names of the targeted individuals as well as a provision that, with the State's consent, Terrazas could fulfill the agreement by providing information to prosecute persons other than the targeted individuals. The State acknowledged that the one-page addendum was not produced for the court's review and explained that it decided not to include the addendum out of an abundance of caution because it was no longer in a position to protect Terrazas from potential gang retaliation stemming from his cooperation, such as it was, with the Ogden Metro Gang Unit. According to the State, the addendum contained only the targeted individuals' names and the parties' signatures. The State agreed with Terrazas that the cooperation agreement allowed for substitution of the targeted individuals in certain circumstances, but it pointed out that the substitution provision was already included in the terms set out in the partial copy of the agreement before the court and presented testimony that the substitution provision was not in the addendum itself.

¶24    Significantly, other than the missing addendum, Terrazas does not assert that the unsigned copy of the cooperation agreement differs from the agreement he signed. And regarding the missing addendum, Terrazas's only claim is that it contained a substitution provision, an assertion the State denied.[10] But even

---

10. Both Terrazas and the State agree that the addendum contained the signatures of the parties and the names of the targeted individuals. There is no dispute that Terrazas signed the original cooperation agreement, and although Terrazas has asserted that the identities of the targeted individuals were never disclosed, his testimony at the review hearing revealed that he was aware of who the three target individuals were. Moreover, the agreement itself provides that the names of the targeted

(continued...)

if Terrazas is correct, Terrazas did not claim that the substitution provision in the addendum was materially different from the one included in the body of the State's copy of the cooperation agreement. *Cf.* Utah R. Evid. 1004(d) (explaining that an original is not required to prove the contents of a writing if the writing "is not closely related to the controlling issue"). Indeed, his testimony about the contents of the substitution provision supports a conclusion either that Terrazas failed to recall the substitution provision's placement in the agreement or that the addendum simply repeated the same substitution language already set out in the cooperation agreement itself. We conclude that, under these circumstances, the admission of the cooperation agreement without the addendum, but with consideration of testimony about the addendum's contents, was within the district court's discretion. Furthermore, its admission did not prejudice Terrazas because there was no material disagreement about the agreement's pertinent terms. *See* Utah R. Crim. P. 30(a) ("Any error . . . which does not affect the substantial rights of a party shall be disregarded.").

B.      The Cooperation Agreement's Compliance Standards

¶25    Terrazas next contends that the cooperation agreement did not spell out his responsibilities clearly enough to inform him what he must do to comply with it and thus, notions of fairness and due process preclude the use of his purported

---

individuals would be identified only in a "separate confidential target list." This language lends support to the State's position that the addendum was a document that the parties had intended to protect as confidential, an intention that the State advanced as the reason for not introducing the addendum into the public record at the review hearing. *See generally United States v. Rodriguez*, 725 F.3d 271, 278 (2d Cir. 2013) (acknowledging "the significant public safety risks to cooperating defendants . . . that exposing even the fact of cooperation may pose" and noting that courts frequently employ measures to reduce that risk).

noncompliance as the basis for lifting the stay and imposing the sentences. In particular, he asserts that the agreement contains ambiguous and contradictory measures of compliance. For example, he contends that one section of the cooperation agreement requires "best efforts" while another requires him to "secure evidence to build prosecutable cases" against the targeted individuals. We conclude that the agreement sufficiently advised Terrazas of the standards by which his compliance is to be determined.

¶26     Earlier, we concluded that a cooperation agreement is analogous to a plea agreement. *See supra* ¶ 15. We therefore turn to our precedent on interpreting plea agreements as guidance for interpreting a cooperation agreement. Utah appellate courts have long held that that "[p]rinciples of contract law provide a useful analytic framework" in cases involving plea agreements. *State v. Patience*, 944 P.2d 381, 386–87 (Utah Ct. App. 1997) ("Many courts, including the Utah Supreme Court and the United States Supreme Court, have referred to plea agreements as contracts and have applied principles derived from contract law to plea agreements."); *see also State v. Davis*, 2011 UT App 74, ¶ 3 & n.2, 272 P.3d 745 ("We apply contract principles to interpret Defendant's plea agreement." (citing *Patience,* 944 P.2d at 386)). Accordingly, we will "apply contract principles to interpret" the cooperation agreement. *See Davis*, 2011 UT App 74, ¶ 3 & n.2.

¶27     The underlying purpose in construing a contract is "to ascertain the intentions of the parties," *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139, and to identify "what the parties reasonably understood to be the terms of the agreement," *United States v. Gregory*, 245 F.3d 160, 165 (2d Cir. 2001) (considering whether the government breached a cooperation agreement when it revoked the agreement after the defendant was arrested for another crime); *accord United States v. Pinter*, 971 F.2d 554, 557 (10th Cir. 1992) (per curiam) (explaining that a court construing a cooperation agreement should ensure that the "promises in cooperation agreements . . . be fulfilled to their fullest extent" by "determining what the defendant

reasonably understood when the agreement was executed" (citation and internal quotation marks omitted)). Generally, we begin this inquiry by "look[ing] first to the plain language of a contract." *See Davis*, 2011 UT App 74, ¶ 3 & n.2 (applying a contract-related plain language approach to interpret a plea agreement). However, in criminal cases, we do not strictly adhere to the plain meaning rule to interpret the agreement. *See id.* ¶ 4 n.3. Rather, "courts are particularly willing to identify ambiguities in plea agreements because of the significant constitutional rights the defendant waives by entering a guilty plea." *Id.* (citation and internal quotation marks omitted). If, however, after "consider[ing] each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none," we determine that the language of the contract is unambiguous, we may interpret its terms based on the plain language. *WebBank*, 2002 UT 88, ¶¶ 18–19 (omission in original) (citation and internal quotation marks omitted).

¶28 The written cooperation agreement set out the terms of Terrazas's cooperation with the State. Paragraph 3 stated that Terrazas was to "cooperate fully with the State of Utah and the agents of the Gang Unit to secure evidence to build prosecutable cases against at least three individual[s] who are currently selling illegal controlled substances and illegally possessing or dealing in firearms." Those "three individuals will be listed on a separate confidential target list that will be incorporated into this agreement." Paragraph 4 then set forth the "services and conduct" that Terrazas was to provide in order to "cooperate fully" in "secur[ing] evidence to build prosecutable cases":

> A. Making a controlled purchase or purchases from the [target] individual[s] . . . and/or acceptable substitutes.
>
> B. Making the necessary introductions between a police agent and the [target] individuals . . . and/or her associates, and/or an acceptable substitute.

  C. Wearing electronic monitoring equipment, upon request, for the purpose of monitoring conversations and interactions with the above referenced individuals and associates.

  . . . .

  E. Any other reasonable requests of . . . agents of the Gang Unit in regard to any of the individuals referenced . . . above . . . .

  F. Defendant agrees to maintain constant and consistent telephonic, electronic, and personal contact with [the] Detective . . . or other members of the Gang Unit to verify his whereabouts and activities. This shall include daily contact with the Gang Unit by one of these methods to insure the Defendant is cooperating and accountable. Defendant understands that his failure to maintain this constant contact with the Gang Unit officers will result in the cancellation of this agreement and the resumption of the court proceedings against him.

¶29 The cooperation agreement also described the level of effort expected from Terrazas. It is in these paragraphs that the heart of the dispute on appeal lies. In paragraph 6, the cooperation agreement stated that Terrazas "will make his best efforts to complete the previously mentioned work by June 11, 2012." Paragraph 7 provided that Terrazas's progress would be reviewed on June 10 and that an extension may be granted "if additional time is needed and if it is determined a good-faith effort is being made." Paragraph 8 informed Terrazas, however, that "*a good faith effort alone*, unaccompanied by prosecutable cases against but not limited to subjects [described] in paragraph three, *will not be considered as compliance with the terms of this agreement*." (Emphasis added.) Finally, paragraph 9 provided that Terrazas's "failure to complete the terms of this agreement

as outlined . . . shall render this agreement null and void. In addition [Terrazas] understands that should the agreement become null and void, the State of Utah will proceed [with] the pending charges for sentencing."

¶30   Contrary to Terrazas's contention, paragraphs 6 through 9 did not impose contradictory measures of performance. Rather, the language could not be plainer, even under the more liberal standards for ambiguity applicable to plea agreements. *See Davis*, 2011 UT App 74, ¶ 4 n.3. Paragraphs 8 and 9 unambiguously inform Terrazas that, "a good faith effort" was not enough on its own; in order to fulfill his obligations under the agreement, he had to actually provide information to build prosecutable cases against the targeted individuals (or acceptable substitutes) by engaging in the activities described in paragraph 3. The references in paragraphs 6 and 7 to "best efforts" and "good-faith," which Terrazas argues are confusing alternative standards for compliance generally, are plainly confined to the requirements for extending the time for him to fulfill the agreement and do not extend to the standards by which his performance was ultimately to be measured. Rather, Terrazas was to use his "best efforts" to obtain information to build prosecutable cases against the three targets by June 11, 2012; however, if Terrazas failed to make that deadline, but was making "a good-faith effort," then the prosecutor could grant an extension of time to comply. This provision for an extension did not obviate the agreement's overarching requirement that Terrazas obtain information to build prosecutable cases against the targeted individuals to fulfill its terms, which was clearly reiterated in paragraph 8: "a good faith effort alone, unaccompanied by prosecutable cases against but not limited to subjects [described] in paragraph three, will not be considered as compliance with the terms of this agreement." And this makes sense under the circumstances. Terrazas was an integral member of a criminal gang that he had co-founded. He had a long criminal history, with little progress having ever been made when previously on parole. And he apparently had simply blown off a prior cooperation agreement by absconding. His best efforts were therefore of little interest to law enforcement, who

could reasonably calculate that the only benefit that could override the risk of putting Terrazas on probation for a number of serious crimes would come from Terrazas actually "secur[ing] evidence to build prosecutable cases" against several other gang leaders. The cooperation agreement therefore was unambiguous about the terms of Terrazas's cooperation.[11]

C.     The State's Good Faith

¶31     Terrazas's claim that he complied with the cooperation agreement depends on an interpretation that the agreement required just his good faith efforts. He does not dispute that his efforts fell short of fulfillment of the agreement's specific terms. Nevertheless, he argues that a finding of breach was unwarranted because his compliance with the cooperation agreement unreasonably hinged upon the good faith of the State, rather than on his own actions. Terrazas's arguments seem to follow two paths: (1) the agreement itself was structured in such a way that he cannot comply without the good faith efforts of the State, and (2) the State actually impeded his ability to comply.

¶32     According to Terrazas, the agreement put his ability to successfully perform at the mercy of the State. He argues, for example, that the agreement required him to obtain enough evidence against at least three individuals to allow them to be prosecuted, yet he could not control whether the State would prosecute. He also argues that the State agreed to allow him to gather evidence against substitute individuals, but the agreement did not provide a "process for how substitutes were to be arranged or negotiated" and "the State specifically faulted him for non-performance against [the] three [targets]" when he had assisted in the arrest of two other individuals. In addition,

---

11. Because we have determined the cooperation agreement was unambiguous, we need not address Terrazas's contention that the agreement amounted to an adhesion contract, "[t]he [ambiguous] terms of [which] are construed against the drafter."

he makes a corollary claim that the cooperation agreement stated that compliance required "prosecutable cases against but not limited to subjects [described] in paragraph three," indicating that even if he had secured information against the three target individuals, the State could still assert that he had not complied. As support for his contention that the agreement depended too heavily on the State's good faith, Terrazas points to the Detective's acknowledgment that Terrazas's "success pretty much depends upon" the Ogden Metro Gang Unit.

¶33    Terrazas's approach, however, fails to acknowledge the implied covenant of good faith and fair dealing, which inheres in all contracts. *See Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 524. That covenant includes a promise by each party "not to intentionally or purposely do anything [that] will destroy or injure the other party's right to receive the fruits of the contract." *Id.* (alteration in original) (citation and internal quotation marks omitted). To fulfill that promise, "a party must act consistently with the agreed common purpose and the justified expectations of the other party." *Id.* (citation and internal quotation marks omitted). Thus, to the extent that Terrazas's performance was dependent upon the State's, the State had an inherent obligation to act in a manner that would allow Terrazas to cooperate. Consequently, the agreement did not provide the State with the kind of arbitrary power to impede his performance that he claims it did.

¶34    Terrazas next contends that the State actually impeded his ability to perform on the agreement, or in other words, that the State violated the implied covenant of good faith and fair dealing. To support this contention, Terrazas argues that he set up drug buys with the targeted individuals but the State failed to follow through with its own control arrangements, resulting in failed attempts to secure information that could have built prosecutable cases.

¶35    On this issue, however, the State testified that it was Terrazas who was at fault because he was notifying the gang unit about controlled buys too close in time to the transaction he

had scheduled when he knew that the police needed more lead time to set up the necessary controls. The district court believed the State on this point, and because there is evidence to support its decision, we will not disturb the court's credibility determination. *See State v. Carlsen*, 638 P.2d 512, 515 (Utah 1981) ("[T]he court, acting as the trier of fact . . . , was authorized to determine the credibility of the witnesses and to believe or disbelieve any witness.").

¶36   We will not disturb the district court's decision that Terrazas failed to fulfill his obligations under the cooperation agreement. Although the State failed to produce a complete, signed copy of the agreement, Terrazas has not demonstrated that the missing addendum contained any information that would have affected the district court's interpretation of the agreement's terms or its evaluation of his compliance. The court correctly interpreted the cooperation agreement as requiring Terrazas to fulfill the contract—a level of performance he did not attain—as opposed to requiring him simply to make good faith efforts to comply. Finally, Terrazas's contention that the State precluded him from complying with the cooperation agreement involved a credibility determination, and we defer to the district court.

CONCLUSION

¶37   The cooperation agreement is not the equivalent of probation, and thus, Terrazas was not entitled to either the notice or the willfulness finding required to revoke probation. The district court afforded Terrazas due process when it considered his compliance with a cooperation agreement at a review hearing, even though the court considered an unsigned copy of the original agreement. The cooperation agreement unambiguously informed Terrazas of the terms of his cooperation, and the court properly interpreted it to require Terrazas to succeed in his cooperation, not merely to make good faith efforts to comply. Furthermore, Terrazas has not demonstrated that the State actually hindered his performance.

We therefore affirm the district court's determination that Terrazas was in breach of the cooperation agreement and its resulting decision to lift the stay on the prison sentences previously imposed.

_____