2020 UT App 84

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ERNEST CLAYTON HARPER,
Appellant.

Opinion
Nos. 20180024-CA and 20180250-CA
Filed May 29, 2020

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
Nos. 161911938 and 131401036

Ronald Fujino, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     Ernest Clayton Harper (Harper) pled guilty to stalking
his ex-girlfriend (Ex-Girlfriend), but attempted to withdraw
that plea after entering it. The district court refused to allow
Harper to withdraw his plea, and Harper now appeals, arguing
that the court abused its discretion by denying his motion to
withdraw, and that his attorney rendered ineffective assistance.
We affirm.

## BACKGROUND

¶2     In 2016, while Harper was on probation in another
stalking case involving a different victim, Ex-Girlfriend reported

to police that Harper had trespassed on her property, sent her hundreds of text messages, and threatened to post nude photos of her on the Internet. The State arrested Harper and charged him with stalking, a second-degree felony,[1] and criminal trespass, a class B misdemeanor. A few months later, Harper entered into a plea agreement with the State in which he agreed to plead guilty to the stalking charge and the State agreed to dismiss the criminal trespass charge. With regard to his eventual sentence, the plea agreement stated as follows: "The State agrees to a two-step 76-3-402 reduction if [Harper] compl[ies] 100% with all terms and conditions of AP&P probation."

¶3 At the plea hearing, Harper acknowledged that "the penalty of this guilty plea could . . . put [him] in prison," and the district court informed him that it could sentence him to prison even though "something less may be recommended." Harper also represented to the court that he was pleading guilty because he had actually committed the crime in question, and not just because he wanted to be released from jail. After a plea colloquy, the district court accepted Harper's plea, released him from jail pending sentencing, ordered Adult Probation and Parole

---

1. Stalking is a second-degree felony if the offender "has been convicted two or more times of the offense of stalking," or "has been previously convicted" of a stalking offense involving a "cohabitant." Utah Code Ann. § 76-5-106.5(7)(e), (8)(b), (8)(d), (8)(f) (LexisNexis Supp. 2019). At the time of his arrest in this case, Harper had pled guilty to stalking in two other cases, although one of those pleas was being held in abeyance. And the victim in one of the other cases was Harper's ex-wife, who qualifies as a "cohabitant" of Harper. *See id.* § 78B-7-102(3)(a) (2018). On appeal, Harper does not challenge the level of his stalking conviction.

(AP&P) to prepare a presentence report, and scheduled a sentencing hearing to take place a few weeks later.

¶4 AP&P completed its presentence report about a week before the scheduled sentencing hearing, and it recommended that Harper be sentenced to prison. Just a few days later, Harper filed a motion seeking to withdraw his plea, although in his motion he did not state the grounds upon which his motion rested; he informed the court that "an accompanying memorandum" would be filed at some point in the future. The district court then postponed the sentencing hearing.

¶5 In the meantime, on the same day Harper filed his motion to withdraw his plea, Harper's ex-wife (Ex-Wife) contacted police to report that Harper had refused to return their child (Child) after parent-time. When police tried to communicate with Harper about returning Child to Ex-Wife's care, they found him uncooperative, and later that day arrested him on suspicion of custodial interference. As two arresting officers were taking Harper into custody, he "became combative" and kicked one of the officers and head-butted the other. As a result of this incident, the State later charged Harper, in a new case, with two third-degree felony counts of "assault by prisoner."

¶6 Several months later, after obtaining new counsel, Harper filed a second motion to withdraw his plea, this time explaining that his "emotional instability prevented him from knowingly and voluntarily appreciating the full . . . consequences of his guilty plea." The new motion came accompanied by a sworn declaration in which Harper averred that his counsel at the time he entered the plea had told him he would get probation if he pled guilty, and that Harper did not know that AP&P would recommend prison.

¶7     The court held a hearing to consider Harper's motion. At that hearing, his attorney asserted that previous counsel had assured Harper "that he would get probation if he pled as charged," and argued that the language of the plea agreement—stating that the State would agree to a sentence reduction as long as Harper "compl[ies] 100% with all terms and conditions of AP&P probation"—would clearly "imply to someone, especially not legally trained," that "the State is agreeing that [Harper] will receive probation." In response, the prosecutor proffered that he and Harper's previous attorney "never talked about probation being agreed upon," and that if there had been an agreement for probation, any such agreement "would have been in the plea form." At the conclusion of the arguments, the court denied Harper's motion, noting that not only had it "told [Harper] . . . that prison was a potential here," but that Harper had "himself volunteered that he knew that this [plea] could put him in prison." The court also observed that Harper had filed the motion "only after he [found] out he ha[d] a prison recommendation [from AP&P], which is not a legitimate reason to withdraw a plea."

¶8     A few months later, after another change of counsel, Harper appeared at a hearing at which, among other things, the court was to determine Harper's sentence on the stalking charge. At the beginning of that hearing, Harper pled guilty to one class A misdemeanor count of assault by prisoner related to his actions upon being arrested for custodial interference. Later during that same hearing, the court heard argument regarding Harper's sentence on the stalking charge, and Harper's new attorney offered several reasons why Harper should be afforded the opportunity of probation, including that the language of the plea agreement appeared to indicate that probation would be part of the sentence. The State, a representative of Ex-Girlfriend, and AP&P all urged the court to send Harper to prison. After

considering the arguments, the court sentenced Harper to a one-to-fifteen-year prison term on the stalking charge.

ISSUES AND STANDARDS OF REVIEW

¶9    Harper now appeals, and asks us to consider two issues.[2] First, he challenges the district court's decision to deny his motion to withdraw his guilty plea. "We review the denial of a motion to withdraw a guilty plea under an abuse of discretion standard, incorporating a clear error standard for findings of fact and reviewing questions of law for correctness." *State v. Magness*, 2017 UT App 130, ¶ 16, 402 P.3d 105.

¶10   Second, he asserts that his attorney rendered ineffective assistance by not asking the State to "clarify[] [its] position for the plea bargain." "When a claim of ineffective assistance of

---

2. In addition to the two issues identified here, Harper also raises another issue in an appeal filed in a different case, the one in which he pled guilty to stalking Ex-Wife. In that appeal, which was consolidated with his appeal from his conviction for stalking Ex-Girlfriend, he initially asserted that the district court abused its discretion by revoking his probation and imposing the original suspended prison sentence. In his appellate brief, however, he acknowledges that, given the wide discretion afforded district courts in making decisions regarding probation revocation, "[t]he court's [probation revocation] sentence . . . cannot be legitimately deemed to be legally unreasonable or excessive under governing law." Accordingly, Harper has effectively withdrawn his challenge to the district court's decision to revoke his probation in the case involving Ex-Wife, and we therefore affirm the district court's final probation revocation and sentencing order in that case.

counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

¶11 In addition to taking issue with the merits of Harper's two arguments, the State also asserts that this court lacks jurisdiction to consider them. Accordingly, before examining the merits of Harper's arguments, we must determine whether they are properly presented for our review.

A

¶12 Both of Harper's claims challenge the propriety of his plea, and on both claims Harper's requested remedy is that he be allowed to withdraw his plea. With the first claim—that the court abused its discretion in denying Harper's motion to withdraw his plea—it is self-evident that Harper is challenging the propriety of his plea. But even the second claim—for ineffective assistance—is grounded in Harper's dissatisfaction with the propriety of his plea: in his brief, Harper asserts that it was the State's lack of clarity as to the terms of the agreement, coupled with his own attorney's allegedly ineffective assistance, that led to entry of the plea, and he asserts that, as a result, he should now be allowed "to withdraw his guilty plea and to proceed to trial."

¶13 The Utah Legislature has enacted a statute (the Plea Withdrawal Statute) that governs the withdrawal of a defendant's plea. Under the terms of that statute, a guilty plea "may be withdrawn only upon leave of the court and a showing

that it was not knowingly and voluntarily made." Utah Code Ann. § 77-13-6(2)(a) (LexisNexis 2017). Any request to withdraw such a plea "shall be made by motion before sentence is announced." *Id.* § 77-13-6(2)(b). And "[a]ny challenge to a guilty plea not made" prior to sentencing "shall be pursued" in a post-conviction proceeding. *Id.* § 77-13-6(2)(c).

¶14    Our supreme court has held that, by requiring defendants to seek withdrawal of guilty pleas prior to sentencing, the Plea Withdrawal Statute "establishes a standard of preservation" and "imposes a strict sanction of waiver that is not subject to" the common-law exceptions to our preservation doctrines, including plain error or ineffective assistance of counsel. *See State v. Rettig*, 2017 UT 83, ¶ 34, 416 P.3d 520 (quotation simplified); *see also State v. Allgier*, 2017 UT 84, ¶¶ 26, 28, 416 P.3d 546 (stating that the Plea Withdrawal Statute "does not allow defendants to work around [its procedural] bar through the exceptions to preservation," and that when a defendant fails to seek withdrawal of a plea before sentencing, that defendant "forfeit[s] his right to a direct appeal" and must pursue any unpreserved challenges in a post-conviction proceeding). And the court recently clarified that "the Plea Withdrawal Statute's preservation rule applies to *all* plea challenges made after sentencing, even where a defendant has made an otherwise timely plea-withdrawal request." *See State v. Badikyan*, 2020 UT 3, ¶ 20, 459 P.3d 967. Thus, the Plea Withdrawal Statute, combined with long-standing preservation doctrines, operates to prevent a defendant from raising, on direct appeal, new grounds for withdrawal of a plea—even by means of plain error review or claims for ineffective assistance of counsel—that were not brought to the attention of the court prior to sentencing. *See id.* ¶¶ 21–22; *Allgier*, 2017 UT 84, ¶ 25; *Rettig*, 2017 UT 83, ¶ 34.

¶15    We agree with the State that, pursuant to these principles, Harper's second claim—that he should be allowed to withdraw

his plea because his attorney was ineffective for failing to clarify the terms of the plea agreement prior to sentencing—is not properly presented for review on direct appeal. Harper did not bring this issue to the attention of the court prior to sentencing, and therefore cannot properly raise this issue on direct appeal, even by means of a claim for ineffective assistance of counsel. Under the terms of the Plea Withdrawal Statute, any such claim must be brought, if at all, in a post-conviction proceeding.

¶16    We are, however, not persuaded that the same is true with regard to Harper's first claim—that the district court abused its discretion in denying Harper's motion to withdraw his plea. Harper filed a timely motion for withdrawal of his plea, which the district court denied. The State asserts that the issues Harper is raising now are not the same as the issues Harper brought to the attention of the district court in connection with his plea withdrawal motion, and that, under *Badikyan*, Harper's appellate claims are unpreserved. After reviewing the record, however, we do not perceive a meaningful distinction, for preservation purposes, between the issues Harper raised below and the issues Harper raises here.

¶17    At the hearing on Harper's motion to withdraw his plea, Harper's attorney argued that Harper should be able to withdraw his plea because his previous counsel had advised Harper "that he would get probation if he pled as charged." Harper's attorney also pointed to the language of the plea agreement—providing that the State would agree to a sentence reduction if Harper "compl[ied] 100% with all terms and conditions of AP&P probation"—and asserted that Harper understood that language to mean that the State would support a sentence including probation, because that language "impl[ies] to someone, especially not legally trained," that "the State is agreeing that [Harper] will receive probation."

¶18    And, as we understand it, Harper's first claim on appeal rests on those same contentions. Harper believes that the district court erred in denying his motion precisely because he thought he would get probation by entering a guilty plea, and he ascribes that mistaken belief to the language of the plea agreement itself, which he argues led him to think that the State had agreed to support a sentence that included probation. We acknowledge the State's point that Harper never argued to the district court that "the plea agreement actually contained an enforceable agreement that the prosecutor would recommend probation," and we agree with the State that Harper could perhaps have been more precise in the arguments he made to the district court. But before both courts, Harper advanced the general argument that the language of the plea agreement indicated that the State would support a sentence of probation, and that he should be allowed to withdraw his plea if that were not going to be the case. Based on our review of the record, and our interpretation of Harper's first claim on appeal, we conclude that Harper adequately preserved this claim for our review.

¶19    Thus, Harper's ineffective assistance of counsel claim is not properly presented for our review, and therefore we do not further discuss it. But Harper's first claim is preserved, and we therefore proceed to address the merits of that claim.

B

¶20    On the merits, Harper's argument is premised on the contention that the plea agreement he signed included the State's agreement that Harper would be afforded the privilege of probation, and that he would not—at least not immediately—be sentenced to prison. As he puts it, "[p]robation was part of the plea bargain, as agreed to by the State." Proceeding from this premise, Harper asserts that the district court abused its discretion by denying his motion to withdraw after it

became plain that Harper would likely not be afforded the privilege of probation. We reject Harper's argument, for several reasons.

1

¶21    As an initial matter, to the extent Harper is asserting that the plea agreement included some sort of ironclad guarantee that his sentence would include probation, that assertion is without merit. The agreement was between Harper and the State—the district court was, of course, not a party. Our rules of criminal procedure provide a mechanism by which parties can seek the district court's input about a recommended disposition prior to entry of a plea. *See* Utah R. Crim. P. 11(i) (allowing a district court to review a "tentative plea agreement" and "indicate to the prosecuting attorney and defense counsel," prior to final entry of the plea, "whether the proposed disposition will be approved"). But the parties did not avail themselves of that procedure in this case, and did not ask the district court, prior to entry of the plea, to sign off on the plea or on any recommended sentence. Indeed, at the plea hearing, Harper clearly expressed an understanding that "the penalty of this guilty plea could . . . put [him] in prison," and the district court informed Harper that it could sentence him to prison even though "something less may be recommended."

¶22    Harper's plea did not include a guarantee of probation. Whatever the meaning of the language in the plea agreement, the court retained the discretion to impose a prison sentence upon Harper, and Harper was well aware of that fact when he entered his plea. We therefore construe Harper's arguments about the language of the plea agreement to be aimed at establishing an obligation on the part of the State to recommend or otherwise support a sentence that included probation.

¶23    On that point, Harper has not carried his burden of demonstrating that the language of the plea agreement includes the State's agreement to recommend a sentence including probation. *See State v. Hummel*, 2017 UT 19, ¶ 82, 393 P.3d 314 (noting that the appellant "bears the burden of proof on appeal"); *cf. State v. Robison*, 2006 UT 65, ¶ 21, 147 P.3d 448 ("Utah courts place the initial burden on the appellant, not on the state, to produce some evidence that the prior conviction was improper." (quotation simplified)). The operative language in the plea agreement is as follows: "The State agrees to a two-step 76-3-402 reduction if [Harper] compl[ies] 100% with all terms and conditions of AP&P probation." Harper interprets this language as an obligation on the part of the State to "keep its word" and "agree[] to probation." The State, on the other hand, asserts that it merely promised to "agree to a two-step reduction if the [district] court had decided to grant probation" and Harper successfully completed it.

¶24    Because a plea agreement is "essentially a contract" between a defendant and the State, *State v. Francis*, 2017 UT 49, ¶ 11, 424 P.3d 156 (quotation simplified), we resolve most disputes about the meaning of a plea agreement's terms by applying general principles of contractual interpretation, *see Hattrich v. State*, 2019 UT App 142, ¶ 18, 449 P.3d 929 ("We apply contract principles when interpreting plea agreements."). Under those principles, we "generally begin" our inquiry "by looking first to the plain language" of the agreement, *id.* (quotation simplified), because the plain language of contracts is usually the best indication of the intent of the drafters, *see Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 ("[T]he best indication of the parties' intent is the ordinary meaning of the contract's terms."). In criminal cases, however, "we do not strictly adhere to the plain meaning rule" to interpret

a plea agreement; rather, "courts are particularly willing to identify ambiguities in plea agreements because of the significant constitutional rights the defendant waives by entering a guilty plea." *See State v. Terrazas*, 2014 UT App 229, ¶ 27, 336 P.3d 594 (quotation simplified).

¶25 If the plain language of a contract is unambiguous, it may be interpreted as a matter of law by the court, without resort to extrinsic evidence as to its meaning. *See Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235. If the language is ambiguous, then a court should examine extrinsic evidence as to the parties' intentions. *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269. If extrinsic evidence is unavailable or does not serve to illuminate the parties' intent, then certain tie-breaking principles come into play, such as the rule that contracts are generally to be construed against their drafter. *See Gillmor v. Macey*, 2005 UT App 351, ¶ 38 n.16, 121 P.3d 57 (stating that the construe-against-the-drafter rule "only comes into play as a kind of tie-breaker, used as a last resort by the fact-finder after the receipt and consideration of all pertinent extrinsic evidence has left unresolved what the parties actually intended" (quotation simplified)). One such tie-breaking rule applicable in criminal cases is the principle that "[a]ny ambiguities in a plea agreement in a criminal case are construed against the government." *See* 21 Am. Jur. 2d *Criminal Law* § 617 (2020); *see also State v. Patience*, 944 P.2d 381, 387 (Utah Ct. App. 1997) ("Both constitutional and supervisory concerns require holding the government to a greater degree of responsibility than the defendant for imprecisions or ambiguities in plea agreements." (quotation simplified)).

¶26 In this case, especially given the rule requiring us to liberally identify ambiguities in plea agreements, *see Terrazas*, 2014 UT App 229, ¶ 27, we conclude that the operative language of the plea agreement is ambiguous. Although the State's

interpretation strikes us as somewhat more plausible on its face, we are unable to say that Harper's interpretation is unreasonable. And when each of the "possible interpretations" of a plea agreement "are reasonable, we consider [it] to be ambiguous." *State v. Samul*, 2018 UT App 177, ¶ 14, 436 P.3d 298; *see also Brady v. Park*, 2019 UT 16, ¶ 55 & n.45, 445 P.3d 395 ("Where we conclude that either of the contract interpretations could reasonably have been what the parties intended, we will not substitute our judgment for that of the parties by choosing what we believe to be the better of the two interpretations.").

¶27   But Harper made no effort before the district court to identify and gather any extrinsic evidence that might shed light on the intentions of the parties. He submitted a sworn declaration of his own, but that declaration contains no indication of what the drafters of the plea agreement intended the operative language to mean; instead, he stated only that he "thought he would be placed on probation" and that his previous attorney told him he would get probation, observations that are as consistent with the State's interpretation of the operative language as they are with his own. And he did not submit an affidavit or declaration from his previous attorney, the individual who negotiated the agreement with the prosecutor.

¶28   On the other hand, the prosecutor who negotiated the agreement was present at the hearing on Harper's motion, and he told the court that he and Harper's previous lawyer "never talked about probation being agreed upon," and that if there had been any such agreement "[i]t would have been in the plea form." The State correctly notes that this statement by the prosecutor represents "the only proffer of relevant extrinsic evidence" placed before the district court as to what the drafters of the operative language intended the agreement to mean.

¶29   We are hesitant to apply the tie-breaking rule—that ambiguities in plea agreements are construed against the State—when Harper has done nothing to present applicable extrinsic evidence of the parties' intent, and where the only piece of relevant extrinsic evidence in the record—the prosecutor's proffer—points in the other direction. In this situation, Harper has not carried his burden of persuading us that the operative language of the plea agreement means what he says it means.

3

¶30   But even if Harper were able to demonstrate that the relevant language of the plea form indicates that the State was obligated to recommend probation, Harper would still not prevail here, because circumstances changed following negotiation of the plea agreement: Harper was again arrested and charged with two felony counts of assault by prisoner, and pled guilty to one such count, reduced to a misdemeanor. We agree with the State that Harper's subsequent actions relieved the State of any obligation it might have had, at the time it entered into the plea agreement, to advocate that probation should be a part of Harper's sentence.

¶31   "When a defendant, as a result of a plea agreement, pleads guilty in exchange for a promise by the state to give a particular sentencing recommendation, there is an implied promise by the defendant that the circumstances under which the bargain was made will remain substantially the same." *State v. Tyler*, 84 P.3d 567, 570 (Idaho Ct. App. 2003); *see also State v. Pascall*, 358 N.E.2d 1368, 1369 (Ohio Ct. App. 1972). "The commission of a crime subsequent to entering a plea agreement and before sentencing is a change in circumstances amounting to a breach of that implied promise and is sufficient to excuse the state from fulfilling its promised recommendation." *Tyler*, 84 P.3d at 570; *see also State v. Delacruz*, 144 F.3d 492, 494–95 (7th

Cir. 1998) (holding that the government was not obligated to abide by a previous promise to recommend a lenient sentence due to the defendant's post-agreement but pre-sentencing criminal activity); *cf. State v. Patience*, 944 P.2d 381, 387 (Utah Ct. App. 1997) (noting that the State may withdraw from a plea agreement if "the defendant has breached the agreement").

¶32   By pleading guilty to one count of assault by prisoner, Harper admitted that he had committed an additional crime after the plea agreement was executed. Accordingly, whatever obligation the State might have had to recommend probation—and, as noted, we are not at all convinced that any such obligation existed—was no longer in effect after Harper was convicted of a new offense committed after entering into the plea agreement. For these reasons, the district court acted within its discretion by denying Harper's motion to withdraw his plea.

CONCLUSION

¶33   The district court did not abuse its discretion in denying Harper's motion to withdraw his guilty plea. And Harper's claim for ineffective assistance of counsel must be brought, if at all, in a post-conviction proceeding.

¶34   Affirmed.

_____