**2015 UT App 72**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JEFFREY CHARLES SALT,
Defendant and Appellant.

Opinion
No. 20130071-CA
Filed March 26, 2015

Third District Court, Salt Lake Department
The Honorable William W. Barrett
The Honorable Elizabeth A. Hruby-Mills[1]
No. 081904756

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1     Jeffrey Charles Salt appeals from his conviction for
aggravated assault, a third degree felony. We affirm.

---

1. Judge William W. Barrett presided over the trial and denied
the defendant's motion to arrest judgment as well as his
alternative motion to reduce his conviction. Judge Elizabeth A.
Hruby-Mills denied the motion for a new trial.

BACKGROUND

¶2    Shortly after Salt began dating his girlfriend (J.G.), she bought a home in Salt Lake City.[2] Salt suggested that she hire him to complete some renovations, and she agreed. J.G. moved in with Salt in April 2006 when her house became unlivable during the remodeling. Over the next couple of years, the renovations became the source of frequent conflict between the two. J.G. moved out of Salt's residence in February 2008 and hired another contractor to finish the work on her home. At that point, Salt ended their relationship. But between February and April 2008, the two continued to see each other and came to a sort of reconciliation. At the end of April, however, J.G. told Salt "this isn't going to work out" and attempted to end their relationship permanently.

¶3    Salt continued to contact J.G., eventually convincing her to meet him at his home in early June to talk things through and help him move past their breakup. When J.G. arrived at the scheduled meeting, Salt told her he wanted to "set some ground rules." He asked J.G. to agree not to leave even if "the questioning got tough." For nearly an hour, Salt asked her questions about their relationship and her decision to end it. When J.G. eventually told Salt she wanted to leave, he responded with misogynistic verbal abuse and then grabbed J.G. and twisted her head. The two ended up on the ground, and Salt grabbed a piece of pottery from a shelf and hit J.G. on the head with it multiple times. J.G. grabbed a phone from the floor and attempted to call 911, but she misdialed, and Salt knocked the phone away before she could reach anyone.

---

2. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Winfield*, 2006 UT 4, ¶ 2, 128 P.3d 1171 (citation and internal quotation marks omitted).

¶4      Salt then grabbed what J.G. thought was a metal pipe and hit her above her eye, drawing blood, before pinning her to the ground. When the two eventually stopped struggling, Salt allowed J.G. to get up. At that point, she saw blood all over the floor and could feel that her head was covered with blood as well. J.G. attempted to leave, but Salt blocked the exit. J.G. said, "[N]o, no, no, just let me out," and then either she pushed her way past him or he stepped aside. Feeling faint, J.G. lay down on the cement walkway in front of Salt's residence where a passerby stopped to give her aid and called 911. At the hospital, J.G. received sixty-five staples in her scalp to close lacerations that totaled roughly eleven inches in length. She continued to suffer back pain for years and, at the time of trial, still had a "lump on the side of [her] head" that felt as if there was "a little piece of the clay in [it]." Salt was charged with aggravated kidnapping, aggravated assault, and damage to a communication device.

¶5      The case was tried to a jury. Salt claimed he acted in self-defense. He admitted using derogatory names to describe J.G. but testified that in response to the name-calling she landed the first blow, hitting him in the left eye. He testified he then put her in a headlock to keep her from further attacking him, and they fell to the ground wrestling. According to Salt, J.G. tried "to gouge [his] face" and then bit his finger and would not let go. In response, he repeatedly struck her head against a bookshelf until she released his finger. He testified that he never hit her with pottery or a metal pipe and that any action he took against J.G. was to protect himself from her attempts to gouge his face, her blows with a phone receiver, and her biting. He said that he was "in fear for [his] safety and [his] life" after J.G. hit him in the face and bit him. Salt also testified that a few months before the incident, J.G. had come to his house to collect some of her belongings. Then, as she was leaving, she "drove her car in reverse and hit [his] car." He then testified, "And I was in the path of that vehicle and I had to move out of the way to avoid being assaulted by the vehicle."

¶6    The defense called a physician friend of Salt's who practiced emergency medicine as an expert witness. Based on his review of J.G.'s medical records, the physician testified that the nature of her injuries did not support a claim that she had suffered direct blows from a metal pipe or a ceramic object. Rather, in his opinion, J.G.'s injuries were most likely caused by a "glancing blow[]" rather than a "direct blow" from an object he did not attempt to describe. The defense also cross-examined law enforcement officers who had responded to the scene. They observed blood all over the apartment, but they neither found a metal pipe nor recovered any pieces of pottery.

¶7    The jury convicted Salt of aggravated assault involving domestic violence but acquitted him of two other charges involving domestic violence—aggravated kidnapping and damage to a communication device. Salt moved to arrest judgment and filed an alternative motion to have his conviction reduced to a class A misdemeanor. The trial court denied his motions. After sentencing, Salt moved for a new trial. The court also denied that motion. Salt appeals.

ISSUES AND STANDARDS OF REVIEW

¶8    First, Salt argues that the aggravated assault jury instruction was incomplete. "[W]e review jury instructions in their entirety to determine whether the instructions, taken as a whole, fairly instruct the jury on the applicable law." *State v. Malaga*, 2006 UT App 103, ¶ 18, 132 P.3d 703 (alteration in original) (citation and internal quotation marks omitted). "Whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444.

¶9    Second, Salt argues that the trial court erred when it denied his motion to reduce his sentence to a class A misdemeanor. We review a trial court's denial of a motion to

reduce the degree of a conviction for abuse of discretion. *State v. Boyd*, 2001 UT 30, ¶ 31, 25 P.3d 985.

¶10    Third, Salt argues that the trial court should have granted his motion for a new trial because the jury's not-guilty verdict on the charge of aggravated kidnapping conflicted with its guilty verdict on aggravated assault. "[W]e review the decision to grant or deny a motion for a new trial only for an abuse of discretion." *State v. Loose*, 2000 UT 11, ¶ 8, 994 P.2d 1237. "When considering a defendant's argument that the verdicts are inconsistent, we . . . will not overturn a jury's verdict of criminal conviction unless reasonable minds could not rationally have arrived at the verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented." *State v. LoPrinzi*, 2014 UT App 256, ¶ 30, 338 P.3d 253 (citation and internal quotation marks omitted), *petition for cert. filed*, Dec. 24, 2014 (No. 20141168).

¶11    Fourth, Salt contends that the definition of "cohabitant" as used in the Cohabitant Abuse Act is unconstitutionally overbroad and vague. Constitutional challenges are matters of law reviewed for correctness. *State v. Pullman*, 2013 UT App 168, ¶ 6, 306 P.3d 827.

¶12    Finally, Salt argues that his counsel was constitutionally ineffective for failing to request an additional element in the jury instruction related to self-defense. We consider claims of ineffective assistance of counsel raised for the first time on appeal as questions of law. *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

ANALYSIS

I. The Aggravated Assault Jury Instruction

¶13    At trial, the jury was instructed that to find Salt guilty of aggravated assault, it must find beyond a reasonable doubt that he used a dangerous weapon or "other means or force likely to

produce death or serious bodily injury" in the course of acting "with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another." Salt contends that this instruction was erroneous because it failed to "require the jury to find that he acted with intent, or knowledge, or recklessness with respect to the result of his conduct." Instead, Salt argues, the instruction required the jury to find only that he used means likely to produce death or serious bodily injury. In other words, Salt argues that the instruction was missing a "vital" mens rea element, i.e., that he must have specifically *intended to cause* death or serious bodily injury, not simply that he *used means* likely to do so.

¶14  In support of his argument, Salt relies on *State v. O'Bannon*, 2012 UT App 71, 274 P.3d 992. We held in *O'Bannon* that the State was required to prove that the defendant acted with intent to cause the victim serious physical injury before a jury could convict him of second degree felony child abuse. *Id.* ¶ 31. We determined that it was not enough "to prove only that [the defendant] intended to be, or knew that he was, engaged in certain conduct without the requisite intent or knowledge that a serious physical injury would likely result." *Id.* Salt argues that we should come to the same conclusion in this case because the aggravated assault instruction did not require jurors to determine that he intended to cause serious bodily injury, but to determine only that his actions were "likely to produce death or serious bodily injury" without ever taking his specific intent into account as he claims *O'Bannon* requires. We conclude that *O'Bannon* does not apply here because our holding in that case was based on a different crime requiring a different mens rea.

¶15  *O'Bannon* involved a charge of second degree felony child abuse, not third degree felony aggravated assault. *Id.* ¶¶ 1, 24. Under the child abuse statute, a person is guilty of second degree felony child abuse if that person inflicts "serious physical injury" and does so "intentionally or knowingly." Utah Code Ann. § 76-5-109(2) (LexisNexis 2012). But the *O'Bannon* jury had been given an "eggshell victim" instruction, stating that "[w]hen

injury ensues from deliberate wrongdoing, *even if it is not an intended consequence*, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted." *O'Bannon*, 2012 UT App 71, ¶ 12 (emphasis added) (internal quotation marks omitted). We determined that this instruction "inaccurately stated the law with regard to the mental state required for the jury to find [the defendant] guilty of second degree felony child abuse." *Id.* ¶ 17. We reached this decision because even though the defendant had seriously injured the child victim, the instruction contradicted the statutory requirement that the defendant must also have *intended* serious physical injury or have known that it would result from his conduct. *Id.* ¶¶ 17, 31.

¶16     In contrast, the crime of third degree felony aggravated assault does not require that a person act with the intent to cause a specific level of harm. *Compare* Utah Code Ann. § 76-5-103(1)(b) (LexisNexis 2008) (defining third degree felony aggravated assault), *and id.* § 76-5-102 (2012)[3] (defining assault), *with id.* § 76-5-109(2) (defining second degree felony child abuse). Instead, the version of the statute that Salt was charged under defines third degree felony aggravated assault as an act causing or creating a substantial risk of bodily injury, committed "with unlawful force or violence," *id.* § 76-5-102, while using a dangerous weapon or "other means or force likely to produce death or serious bodily injury," *id.* § 76-5-103(1)(b), (3) (2008). The specific intent to cause "serious bodily injury" was an element of second degree felony aggravated assault, not the third degree felony with which Salt was charged. *See id.* § 76-5-103. And our precedent recognizes that specific intent to inflict serious bodily injury—or knowledge that such injury is likely to occur—is not required for a third degree felony aggravated

---

3. Where amendments made to the relevant statutes since the time of the incident are not substantive, we cite to the current version of the Utah Code for the convenience for the reader.

assault conviction under the version of the statute that is applicable here. *See id.* (current version at *id.* § 76-5-103(1), (2)(a) (2012)). For example, in *State v. Mangum*, 2013 UT App 292, 318 P.3d 250 (per curiam), we noted that because the defendant "was charged and convicted under subsection (1)(b)" of the 2008 version of the statute, and not with a second degree felony under subsection (1)(a), "there was no requirement to show specific intent in order to support [the defendant's] conviction." *Id.* ¶¶ 6–7; *see also State v. Potter*, 627 P.2d 75, 78 (Utah 1981) (holding that an instruction stating that "specific intent" is not required to "violate the law but merely an intent to engage in acts or conduct that constitute the elements of a crime" was appropriate for an aggravated assault charge (internal quotation marks omitted)); *State v. McElhaney*, 579 P.2d 328, 328 & n.2 (Utah 1978) (holding that when aggravated assault is committed by use of a deadly weapon "or such means or force likely to produce death or serious bodily injury," "no culpable mental state is specified" (internal quotation marks omitted)); *State v. Howell*, 554 P.2d 1326, 1328 (Utah 1976) (agreeing with the parties that third degree felony aggravated assault requires only general intent).

¶17 We therefore conclude that the trial court did not err when it determined that the third degree felony aggravated assault instruction correctly stated the law and for that reason refused to arrest judgment or grant a new trial.

## II. Motion to Reduce Degree of Conviction

¶18 Prior to sentencing, Salt moved to have his conviction reduced from third degree felony aggravated assault to class A misdemeanor assault under section 76-3-402 of the Utah Code (a section 402 reduction), because a felony conviction "would be unduly harsh" and because "[h]e ha[d] no significant prior criminal record." Salt also argued that he would be unable to continue in his position with a nonprofit organization if convicted of a felony. The trial court denied the motion. Salt argues that the court abused its discretion in failing to grant him

a section 402 reduction. He also contends that the trial court's decision violated the *Shondel* doctrine and failed to comply with the rule of lenity.

¶19   Salt argues on appeal that a reduction of his sentence is required under the *Shondel* doctrine. The *Shondel* doctrine establishes that "where two statutes define exactly the same penal offense, a defendant can be sentenced only under the statute requiring the lesser penalty." *State v. Bluff*, 2002 UT 66, ¶ 33, 52 P.3d 1210 (citing *State v. Shondel*, 453 P.2d 146, 147–48 (Utah 1969)). Salt argues that "[t]here is no meaningful distinction" between the acts required to commit the two crimes because in either case the actual result could be the same—substantial bodily injury, the kind of injury that Salt inflicted here.

¶20   But the *Shondel* doctrine applies only if the two crimes "have identical elements and prohibit exactly the same conduct." *Id.* The elements of the lesser offense Salt argues for—a class A misdemeanor simple assault—are not the same as the third degree felony aggravated assault of which he was convicted. *Compare* Utah Code Ann. § 76-5-102 (defining simple assault), *with id.* § 76-5-103(1)(b), (3) (2008) (defining third degree felony aggravated assault). And the fact that an act committed under either statute may actually result in the same injury does not mean the crimes are wholly duplicative. While the severity of injury required by the misdemeanor assault statute and the injury actually inflicted in connection with a third degree felony may sometimes be the same, the culpable conduct required for each is different. Class A misdemeanor assault requires only an act "committed with unlawful force or violence," *see id.* § 76-5-102 (2012), while third degree felony aggravated assault requires the use of a dangerous weapon or "other means or force *likely to produce*" more grave consequences—"serious bodily injury" or even death, *id.* § 76-5-103(1)(b), (3) (2008) (emphasis added). Thus, each of these crimes describes conduct that is significantly different in both conduct and *potential* for harm, differences that are reflected in the

elements each crime requires for conviction. Because the two statutes fail to "address exactly the same conduct," the *Shondel* doctrine does not apply. *See Bluff,* 2002 UT 66, ¶ 33 (citation and internal quotation marks omitted).

¶21 Salt also argues that the rule of lenity requires that his conviction be reduced. He contends that the statutory scheme surrounding the varying degrees of assault is ambiguous because "there are no standards assisting a trial court in distinguishing" between the types of bodily injury that determine whether the assault will result in a misdemeanor or felony conviction for the defendant. He argues that "the determination is [thus] left to the arbitrary conclusions of the prosecution" and renders the statutes unconstitutionally vague.

¶22 "[L]enity is an ancient rule of statutory construction that penal statutes should be strictly construed against the government . . . and in favor of the persons on whom such penalties are sought to be imposed." *State v. Rasabout*, 2013 UT App 71, ¶ 31, 299 P.3d 625 (omission in original) (citation and internal quotation marks omitted), *cert. granted*, 308 P.3d 536 (Utah 2013). In other words, lenity serves "as an aid for resolving an ambiguity" in a statute. *Albernaz v. United States*, 450 U.S. 333, 342 (1981). We noted in *State v. Rasabout*, 2013 UT App 71, 299 P.3d 625, that "our Legislature appears to have rejected the rule of lenity as a permissible canon of statutory construction." *Id.* ¶ 31. But in *Rasabout* we determined that even if the rule of lenity were applicable, there was no ambiguity in the pertinent statute. *Id.* ¶ 32. We come to the same conclusion here.

¶23 Assault and aggravated assault, the statutory crimes that Salt claims are ambiguous and unconstitutionally vague, employ varying levels of bodily injury to differentiate degrees of criminal assault. For example, class B misdemeanor assault proscribes the infliction or creation of a substantial risk of "bodily injury"—or an attempt or a threat to inflict it. *See* Utah Code Ann. § 76-5-102(1), (2) (LexisNexis 2012). And "[b]odily injury" is defined as "physical pain, illness, or any impairment

of physical condition." *Id.* § 76-1-601(3). But class A misdemeanor assault requires that the assault result in "substantial bodily injury." *Id.* § 76-5-102(3). "Substantial bodily injury" is defined as "bodily injury, not amounting to serious bodily injury, that creates or causes protracted physical pain, temporary disfigurement, or temporary loss or impairment of the function of any bodily member or organ." *Id.* § 76-1-601(12). And Utah law defines "[s]erious bodily injury" as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-601(11). Third degree felony aggravated assault requires the assault to involve either a dangerous weapon or "other means or force likely to produce death or serious bodily injury." *Id.* § 76-5-103(1)(b), (3) (2008). And an aggravated assault becomes a second degree felony only if it "causes serious bodily injury." *Id.* § 76-5-103(1)(a), (2).

¶24    Salt provides no analysis or explanation as to how the statutory definitions of the pertinent degrees of bodily injury are so indistinguishable from one another as to be ambiguous. Ambiguity is defined as "[a]n uncertainty of meaning or intention." *Black's Law Dictionary* 93 (9th ed. 2009). Here, there is no uncertainty as to the meaning or definitions of the terms with which Salt finds fault, as the legislature has specifically defined each term. As a result, the "rule of lenity," even if available as a canon of statutory construction, is not applicable here.

¶25    For the same reason, Salt's related claim that the statutes are unconstitutionally vague is unavailing. As long as a statute "is sufficiently explicit to inform the ordinary reader what conduct is prohibited" we will not find it unconstitutionally vague. *State v. MacGuire*, 2004 UT 4, ¶ 14, 84 P.3d 1171 (citation and internal quotation marks omitted). Further, if the meaning of a statute is "readily ascertainable," it "does not encourage or facilitate arbitrary and discriminatory enforcement." *Id.* ¶ 32. Having already found that the ambiguity Salt urges does not exist, we conclude that the statutes at issue here are "sufficiently

explicit." *See id.* ¶ 14 (citation and internal quotation marks omitted). As discussed, the statutes provide specific definitions for each of the degrees of bodily injury that accompany the various degrees of assault. We therefore conclude that the meaning of the statutes is "readily ascertainable." *See id.* ¶ 32.

¶26 Finally, Salt's contention that the trial court's refusal to reduce his conviction to a class A misdemeanor was "unduly harsh" is unpersuasive. Under section 76-3-402 of the Utah Code, a court may reduce the degree of a conviction by one level if, having considered "the nature and circumstances of the offense" and "the history and character of the defendant," the court "concludes [that] it would be unduly harsh to record the conviction as being for that degree of offense established by statute." Utah Code Ann. § 76-3-402 (LexisNexis 2012). By its nature, such a decision is one of judgment and discretion. The court did not exceed its discretion when it determined that Salt's clean criminal history and potential job problems did not warrant such a reduction given the circumstances of this case, including the injuries inflicted on J.G. In addition, the trial court expressly stated that it would consider a renewed motion under section 402 in the event Salt successfully completed his probation.

## III. Conflicting Verdicts

¶27 Salt contends that he was entitled to a new trial because "the verdict acquitting him of aggravated kidnapping necessarily conflicted with his conviction of aggravated assault and therefore he should have been acquitted of the aggravated assault as well."

¶28 We considered a similar argument in *State v. LoPrinzi*, 2014 UT App 256, 338 P.3d 253, *petition for cert. filed*, Dec. 24, 2014 (No. 20141168), where the defendant was convicted of two counts of unlawful sexual activity with a minor and acquitted of a third count. *Id.* ¶ 29. There, the defendant argued that all three counts "involved the same witnesses, same parties, same

allegations, and same evidence." *Id.* (internal quotation marks omitted). Accordingly, she argued that "the jury would have [to] either convict on all Counts, or acquit on all Counts." *Id.* (alteration in original) (internal quotation marks omitted). We concluded, however, that "[w]e are under no duty" to reconcile seemingly inconsistent acquittals and convictions because the jury is free to determine "that the evidence only supported one conviction." *Id.* ¶ 31 (citation and internal quotation marks omitted). Therefore, a "claim of inconsistency alone is not sufficient to overturn [the] conviction; rather, [t]here must be additional error beyond a showing of inconsistency because appellate courts have always resisted inquiring into the jury's thought processes and deliberations." *Id.* ¶ 30 (citation and internal quotation marks omitted).

¶29    Salt argues that such additional error exists here because the aggravating factor the prosecution alleged for the aggravated kidnapping charge was essentially the assault for which he was convicted and thus the jury must have decided he did not commit the assault when it acquitted him of the aggravated kidnapping charge. As we noted in *LoPrinzi*, "so long as sufficient evidence supports each of the guilty verdicts, state courts generally have upheld the convictions." *Id.* (citation and internal quotation marks omitted). In determining whether the evidence is sufficient, "we review the evidence in the light most favorable to the verdict and will not overturn a jury's verdict of criminal conviction unless reasonable minds could not rationally have arrived at the verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented." *Id.* (citation and internal quotation marks omitted). Here, the version of the evidence most favorable to the jury's verdict was that Salt assaulted J.G. and hit her with a metal pipe, a piece of pottery, or both, causing her significant head injuries and lingering residual pain in her back. Based on this evidence, the jury could reasonably have determined that Salt assaulted J.G. with a dangerous weapon or "other means or force likely to produce death or serious bodily injury." *See* Utah Code Ann. § 76-5-103(1)(b) (LexisNexis 2008).

¶30    We therefore conclude that the evidence was sufficient to support the aggravated assault conviction and that the trial court did not err when it refused to grant a new trial on the basis of inconsistent verdicts.

## IV. Constitutionality of the Cohabitant Abuse Act

¶31    Salt contends that the term "cohabitant," as used in the Cohabitant Abuse Act, is both unconstitutionally overbroad and unconstitutionally vague. As a result, he argues the domestic violence designations attached to his charges were inappropriate and that "the jury should not have been instructed with regard to finding such a status." The Cohabitant Abuse Act provides that a second or subsequent conviction for certain domestic violence offenses is subject to enhanced penalties. Utah Code Ann. § 77-36-1.1(2) (LexisNexis 2012). "[D]omestic violence" is defined as "any criminal offense involving violence or physical harm . . . when committed by one cohabitant against another." *Id.* § 77-36-1(4). Defendant argues that the term "cohabitant," as used in this act—and specifically the act's last alternative definition, "a person who . . . resides or has resided in the same residence as the other party"—is unconstitutionally overbroad because it unduly inhibits "First Amendment freedom of association rights." *See id.* §§ 77-36-1, 78B-7-102. In other words, he argues that the act criminalizes "entirely innocent behavior, the mere act of residing with another." And he argues that the phrase "has resided" is unconstitutionally vague because it is unqualified and does not provide sufficient notice as to what behavior is being proscribed.

### A.    Unconstitutional Overbreadth

¶32    Salt refers us to *Salt Lake City v. Lopez*, 935 P.2d 1259 (Utah Ct. App. 1997), where we determined that "[s]tatutory language is overbroad if its language proscribes both harmful and innocuous behavior." *Id.* at 1263 (citation and internal quotation marks omitted), *superseded by statute on other grounds as recognized by Baird v. Baird*, 2014 UT 8, 322 P.3d 728. In *Lopez*, we

determined that a "statute is not unconstitutionally overbroad unless it renders unlawful a substantial amount of constitutionally protected conduct." *Id.* We noted, however, that "[t]he overbreadth doctrine has not been recognized outside the limits of the First Amendment." *Id.* Salt contends that the definition of "cohabitant" restricts a person's right to freedom of association under the First Amendment by "criminalizing entirely innocent behavior, the mere act of residing with one another."

¶33    "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *State v. Norris*, 2007 UT 6, ¶ 13, 152 P.3d 293 (emphasis omitted) (citation and internal quotation marks omitted). If the statute does not reach a substantial amount of such conduct, the overbreadth claim fails. *Id.* As Salt notes, the United States Supreme Court has recognized that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984). Further, the Supreme Court has recognized that "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (citation and internal quotation marks omitted). However, to warrant First Amendment protection, those engaging in their right of free association must "engage in some form of expression, whether it be public or private." *Id.* at 648.

¶34    The Cohabitant Abuse Act does not penalize a person for choosing to reside with another person, as Salt claims, nor does it inhibit any protected form of expression. Instead, the act only prohibits criminal conduct against a cohabitant that "involv[es] violence or physical harm or threat of violence or physical

harm." *See* Utah Code Ann. §§ 77-36-1(4), -1.1 (LexisNexis 2012). Violence and threats of violence against cohabitants are not the sort of "form of expression" that the First Amendment right of association is meant to protect from government intrusion; indeed, such conduct is universally criminalized. Rather, the Cohabitant Abuse Act is designed to promote the value of the relationships the act encompasses by discouraging physical violence in such relationships. Because the act does not constrain any speech or conduct protected by the First Amendment, the fact that its broad definition of "cohabitant" may theoretically bring within its reach such attenuated relationships as, for example, former roommates, may raise questions of policy without necessarily implicating constitutional overbreadth. This is especially true in a case such as this one, where Salt and J.G. had lived together for a substantial time and the violence stemmed from their prior intimate relationship. We therefore conclude that Salt's claim of overbreadth fails.

B.      Unconstitutional Vagueness

¶35    Salt also claims that the definition of "cohabitant" is unconstitutionally vague. He argues that "[n]o evidence exists that he was put on notice or was otherwise aware that he had somehow permanently attained the status of 'cohabitant' simply because he once resided with" J.G. A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or if it "authorizes or even encourages arbitrary and discriminatory enforcement." *State v. Ansari*, 2004 UT App 326, ¶ 42, 100 P.3d 231 (citation and internal quotation marks omitted). The burden of showing that a statute is unconstitutionally vague is a heavy one because "a defendant has the burden of proving that the statute is impermissibly vague in *all* of its applications." *Id.* ¶ 44 (emphasis added) (citation and internal quotation marks omitted). "Thus, a defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as

applied to the conduct of others." *Id.* (citation and internal quotation marks omitted).

¶36   Our "primary objective" when interpreting statutory language "is to give effect to the legislature's intent" as expressed in the text of the statute. *State v. Maestas*, 2012 UT 46, ¶ 195, 299 P.3d 892 (citation and internal quotation marks omitted). In doing so, we will consider the plain language and also the purpose of the statute. *Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147. Our decision in *Keene v. Bonser*, 2005 UT App 37, 107 P.3d 693, is instructive here. In *Keene*, we considered the "resides or has resided" definition of "cohabitant" in the context of a statute that sets forth the procedure for domestic violence victims to obtain a protective order. *Id.* ¶¶ 2, 8. In that case, we determined that the plain meaning of "reside" was "[t]o dwell permanently or for a length of time; to have a settled abode for a time." *Id.* ¶ 11 (alteration in original) (citation and internal quotation marks omitted). We also defined "residence" according to its plain meaning—"a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." *Id.* (citation and internal quotation marks omitted). And we further noted that one of the purposes other states have recognized for implementing statutes such as the Cohabitant Abuse Act is "'to protect others[, beyond spouses,] from abuse occurring between persons in a variety of significant relationships.'" *Id.* ¶ 15 (alteration in original) (quoting *State v. Kellogg*, 542 N.W.2d 514, 517 (Iowa 1996)). Such a purpose is supported by the plain language of our own statute, which increases the penalty for criminal offenses "involving violence or physical harm . . . when committed by one cohabitant against another." *See* Utah Code Ann. §§ 77-36-1(4), -1.1(2).

¶37   Salt's conduct in the context of his relationship with J.G. falls well within the scope of the statute's definition and purpose. *See Ansari*, 2004 UT App 326, ¶ 44. Here, Salt and J.G. lived together in an intimate relationship in Salt's permanent home for nearly two years. And it was only about two months

after J.G. moved out that Salt violently assaulted her during a discussion directly related to their prior romantic relationship. Salt's behavior is exactly the type contemplated by statutes like the act which are aimed at protecting those in "a variety of significant relationships" from the increased vulnerability to abuse that those relationships may create, even after they end. *See Keene*, 2005 UT App 37, ¶ 15 (citation and internal quotation marks omitted). Because we conclude that the kind of relationship Salt had with J.G. fell well within the central focus of the act's definition of "cohabitant," and because that definition "provide[s] people of ordinary intelligence" fair notice, Salt's unconstitutional vagueness claim fails. *See Ansari*, 2004 UT App 326, ¶ 42 (citation and internal quotation marks omitted).

## V. Ineffective Assistance of Counsel

¶38 Salt's final claim is that his trial counsel was ineffective for failing to request that the court include an additional factor for the jury's consideration in one of the self-defense jury instructions. Under Utah law, "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force . . . is necessary to defend the person . . . against another person's imminent use of unlawful force." Utah Code Ann. § 76-2-402(1)(a) (LexisNexis 2012). The self-defense statute also states that in determining the "imminence or reasonableness" of an attack or response,

> the trier of fact may consider, but is not limited to, any of the following factors: (a) the nature of the danger; (b) the immediacy of the danger; (c) the probability that the unlawful force would result in death or serious bodily injury; (d) *the other's prior violent acts or violent propensities;* [and] (e) any patterns of abuse or violence in the parties' relationship.

*Id.* § 76-2-402(5) (emphasis added). Salt argues that Jury Instruction No. 20, which purported to address these factors, failed to include the fourth factor listed in the statute—"the other's prior violent acts or violent propensities."[4] *See id.* He argues that his counsel was ineffective for failing to ensure that this factor was included because it was implicated by evidence presented at trial that J.G. had previously attempted to hit him with her car.

¶39    To establish ineffective assistance of counsel, a defendant must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because both prongs are required, "an appellate court may skip to the second prong . . . and determine that the ineffectiveness, if any, did not prejudice the trial's outcome." *State v. Perry*, 2009 UT App 51, ¶ 11, 204 P.3d 880 (citation and internal quotation marks omitted). "To satisfy the prejudice prong, it is not enough to show that the alleged errors had some conceivable effect on the outcome of the trial but, rather, defendant must show that a reasonable probability exists that, but for counsel's error, the result would have been different." *State v. Millard*, 2010 UT App 355, ¶ 18, 246 P.3d 151 (citation and internal quotation marks omitted). Salt first argues that"[b]y failing to request a very crucial element of self-defense," counsel prevented the jury from being given the "opportunity to consider in its deliberations the effect of the prior assault by [J.G.]." He argues that "the result may very well have been different" had the jury been permitted to consider this evidence.

¶40    We conclude that Salt has not shown that counsel's failure to object to the jury instruction prejudiced his case. Even if the

---

4.The jury instruction also failed to list the fifth factor described in the statute, but Salt does not appeal the omission of that factor.

"prior violent acts or prior violent propensities" factor had been included, Salt has failed to show a reasonable probability exists that the outcome would have been different. Salt argues he was prejudiced because the missing factor deprived him of the opportunity to argue his theory of self-defense and the jury of the ability to consider it. Put another way, Salt contends counsel was prevented from arguing that Salt reacted to J.G. both reasonably and in self-defense in light of the parties' history and that had counsel been able to do so, Salt would not have been convicted. We disagree.

¶41     First, Jury Instruction No. 20 clearly stated that the jury was "not limited" only to the factors listed in the instruction. The jury was therefore free to consider Salt's testimony that his actions were a justified response to J.G. hitting him in the eye because J.G. had previously tried to hit him with a car. And just as the missing factor did not prevent the jury from considering any evidence presented to it related to self-defense, neither did it prevent counsel from arguing a theory of self-defense to the jury during closing arguments. Indeed, while counsel did not specifically mention the alleged prior incident of attempted vehicular assault, he did focus several of his closing remarks on the allegation that J.G. struck Salt first. And counsel also characterized J.G. as a person who initiates violence, refuting Salt's claim that the missing factor precluded him from making an argument about J.G.'s alleged propensity. Counsel argued to the jury, "She started this by hitting him the eye, she was the aggressor," and, "[H]e's got the bruise on his eye to prove [it]." Counsel also told the jury, "If someone comes up to you and punches you in the eye, . . . in Utah, you don't have to run away, you can stand your ground and defend yourself and especially when you're in your own home." And counsel further told the jury that Salt was reasonable in his response because "he's entitled to defend himself however he needs to make sure that [the attack] doesn't get worse."

¶42     It is worth noting that Salt does not argue trial counsel was somehow deficient in his arguments because he did not call

the jury's attention to the incident involving J.G.'s car during closing arguments. Salt only argues that he was prejudiced by the missing factor in the jury instruction because its absence prevented counsel from arguing it and the jury from considering it. So the question of whether counsel was ineffective for failing to include the incident in his jury arguments related to Salt's theory of self-defense is not before us. Instead, we need only determine whether, as Salt contends, counsel was actually prohibited from making such an argument had he chosen to. We are not persuaded that the missing jury instruction prevented counsel from presenting for the jury's consideration any legitimate arguments related to Salt's theory of self-defense or that it influenced the trial's outcome in the way that Salt claims. Accordingly, Salt's ineffective assistance of counsel claim fails.

CONCLUSION

¶43 We conclude that the trial court did not err when it denied Salt's motions to arrest judgment or grant a new trial on the grounds that the jury instruction on aggravated assault was erroneous and prejudicial. We further determine the trial court did not err when it refused to reduce his conviction. We also conclude that the trial court did not abuse its discretion when it refused to grant a new trial on conflicting verdicts. We also do not find the Cohabitant Abuse Act to be unconstitutional. Finally, we conclude that Salt did not receive ineffective assistance of counsel. Accordingly, the trial court's denial of Salt's motions for a new trial or to arrest judgment and his conviction are affirmed.

_____