2020 UT App 97

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID DANIEL BROTHERSON,
Appellant.

Opinion
No. 20190262-CA
Filed June 18, 2020

Fourth District Court, Provo Department
The Honorable James R. Taylor
No. 161401544

Earl G. Xaiz, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES KATE APPLEBY and DAVID N. MORTENSEN concurred.

ORME, Judge:

¶1 Appellant David Daniel Brotherson argues that the district court exceeded its discretion when it declined to reduce his felony convictions of burglary and aggravated assault to class A misdemeanors. He further argues that by defending the district court's ruling on appeal, the State breached the plea agreement it entered into below. We reject both arguments and affirm.

BACKGROUND

*The Plea Agreement*

¶2     In May 2016, the State charged Brotherson with burglary, rape, and forcible sexual abuse. Brotherson agreed to plead guilty to burglary, a second-degree felony, and aggravated assault, a third-degree felony. In exchange, the prosecutor agreed to "recommend[] probation" and "stipulate[d] to a two level reduction on [the burglary conviction], and a one level reduction [on the aggravated assault conviction], upon [Brotherson's] successful completion of probation, pursuant to § 76-3-402 Utah Code," which would have resulted in both counts being reduced to class A misdemeanors. The factual basis of the plea was as follows:

> On May 19, 2016, [Brotherson] and others had been to the victim's home for a get together. [Brotherson] and the others left the home later on, but [Brotherson] then returned to the home, reentered the home through an unlocked door, and entered the victim's bedroom without her consent. He then engaged in sexual activity, wherein he believed she was consenting. During the course of this activity, his conduct, because of the circumstances, created a "substantial risk of serious bodily injury."

¶3     Additionally, during the plea colloquy,[1] the prosecutor offered a further factual basis for the plea, stating that

---

1. We were not provided a transcript of the hearing in which the plea colloquy occurred. We quote from a recitation by the district court in its ruling on Brotherson's motion to reduce the level of his convictions. Nothing in the record suggests, nor has Brotherson argued, that he objected to the State's supplemental

(continued…)

[Brotherson] had been at the victim's house previously that evening and left. He texted her and communicated with her that he wanted to come back. She told him not to come back. She went to bed. He entered the house without permission, got into bed with her, touched her breasts and vagina, and then had intercourse with her without consent.

¶4 Before entering into the plea agreement, however, Brotherson underwent a psychosexual evaluation in which he proffered a different version of the facts. The doctor administering the evaluation wrote that Brotherson told him that

he dropped off his friend and called the woman whose house they had been at, and, "We were texting back and forth." He indicated they talked about him coming over. He questioned her, asking if she was sure she wanted him to come over. He stated that she replied, telling him she had just taken a sleeping pill, and, "If I was going to come over, to do it quick." . . . He said he drove back to her house and knocked on her door. He stated she answered the door, saying, "She was in a t-shirt and panties. She called me back to her room. There was a light on. I laid on the bed and she was standing up doing something and we were talking back and forth." He said he was lying on his side, and, "She laid next to me like we were spooning." He indicated she took his arm and laid it across her stomach, saying, "We were laying there. My crotch was next to her behind and she started to move around a little bit and I thought I heard her moan. The next thing, we were both getting my penis out

---

(…continued)
factual basis during the plea colloquy or that the court's recitation of that further factual basis was inaccurate.

and I stuck it between her legs above her panties, and we started to grind." He contended he never heard her say "no." He continued by saying, "She never told me to stop. We were in a difficult position so when I repositioned myself I got myself hard and I got in the same position and, as I started to ejaculate, I took off my shirt and cleaned off the semen and laid there for a few minutes and then I said I was going to go home." He stated he then picked up his clothing and left. He reported that during their interaction, "I can't remember if I touched her breasts. I could have but it wouldn't have been for very long." He stated that at no point did he grab her throat or make any threatening statements towards her. He contended he was never on top of her. He reported their relationship is complicated by the fact that they had been sexually active previously, months earlier, while they were at his house.

¶5 During this evaluation, the doctor noted that "Brotherson does not report having committed a sex offense." The doctor also noted that Brotherson "does not report having used force in a sexual encounter" and "believes the sexual behavior happened because the person already had sexual experience and wanted and liked the sex things that happened." The doctor concluded that if Brotherson "had acted with force, violence, or without consent, he would need to participate in treatment . . . [but] it is unclear this had been the case." The doctor suggested it would be "worthwhile for . . . Brotherson to voluntarily submit to a polygraph examination to explore this further," because if he "has not committed the offense he has been accused of, there would be less need for him to participate in sex offender specific treatment."

¶6 The court accepted Brotherson's plea and ordered Adult Probation and Parole (AP&P) to prepare a presentence

investigation report (PSIR). As part of that report, Brotherson provided the following written statement:

> I called [the victim] and texted her about coming back to her house. We texted back and forth and I ended up going back to her house and entered her home through the side door that we had entered through earlier that night. I walked back to her room and [the victim] was there and I layed down on her bed. We talked for a few minutes and then she laid down beside me. I began to touch [the victim] and began to grind on her from behind. Thinking everything was consensual. I continued to grind with her from behind and at this time my penis was in between her legs rubbing on the outside of her panties. I know from [the victim] that she was not ok with this. I admit my behavior [w]as not normal for me and regret and feel very sorry for ever[] going back to her house. After grinding I ejaculated on her leg and took my shirt off and cleaned her off. Still thinking everything was ok I laid there for a few minutes then gathered my things and left.

¶7    The investigator who prepared the PSIR informed the court that Brotherson denied having any sexual interaction with the victim before this offense, which contradicted the story he told the doctor during his psychosexual evaluation. Determining that Brotherson not only entered the home intending to commit a sexual act, but also committed that act, the investigator deviated from the sentencing guidelines, which recommended no imprisonment, and recommended prison time.

### Sentencing and Probation

¶8    At sentencing, the district court stated that although "this is a heinous offense," it would not impose prison time "because there is no criminal history that [would warrant] an immediate

commitment to prison." The court noted, however, that the psychosexual evaluation was "really no help at all" because "[t]he results were inconclusive, [and] the facts, apparently that were reported to the examiner differ from the facts that have been admitted to." The court then sentenced Brotherson to a suspended prison sentence and placed him on probation for thirty-six months. As a condition of probation, the court ordered Brotherson to serve one year in jail, even though the sentencing matrix recommended 0–210 days in jail, and to complete any treatment AP&P recommended, including taking a polygraph exam if required.

¶9 Approximately eight months into his one-year condition-of-probation incarceration, Brotherson was released from jail for good behavior. He then submitted to a polygraph exam. During the exam, "Brotherson was asked if he forced his victim to engage in sexual contact with him and if he let himself into the victim's house." Brotherson answered in the negative to both questions, and his "responses scored as 'no significant responses observed,'" so he "was determined to be telling the truth by the polygrapher." After his release from jail, Brotherson also entered sex-offender treatment. This treatment was terminated after only four weeks, when the psychologist in charge of Brotherson's therapy categorized him as "very low risk" and deemed that he had no need for further treatment based on the results of the polygraph test and other assessments.

¶10 Seven months after Brotherson's release from jail, AP&P requested that the district court terminate his probation early on the grounds that he "has completed everything asked of him and has done so quickly, remained crime free and probation violation free." The court denied the request because it "was not satisfied that sex therapy had been as 'successful' as the doctors had declared since their conclusion seem[s] rooted in reliance upon 'no response' to questions that directly contradicted findings admitted and then made in connection with the sentencing in this case."

¶11 Approximately four months later, Brotherson moved the district court to terminate his probation in accordance with Utah Code section 64-13-21(7) on the ground that he had had no probation violations for eighteen months. The court heard argument on the matter and granted the motion, terminating Brotherson's probation as successfully completed.

*402 Reduction*

¶12 Brotherson then filed the motion at issue in this appeal—which the prosecutor stipulated to in accordance with the plea agreement—requesting that the district court reduce his burglary and aggravated assault convictions to class A misdemeanors pursuant to Utah Code section 76-3-402. Brotherson argued he was entitled to the reduction on the grounds that he (1) "has no other criminal history"; (2) "was an exemplary inmate and probationer"; (3) completed everything the court "asked him to do in an expedient manner"; (4) was "continuing with counseling, despite the fact that he was successfully discharged from court ordered counseling"; (5) had stable employment but "his ability to progress in the company and his income potential are restricted due to his felony convictions"; and (6) had "gotten his life back on track so that he can be a good father to his children and continue to provide for them." While the prosecutor stipulated to this motion, the victim, who was not bound by the stipulation, opposed it.

¶13 After finding that all applicable statutory requirements for the requested reduction had been met, the court turned to whether it "would be 'in the interest of justice'" to reduce Brotherson's convictions under section 76-3-402(3)(a)(v). In conducting this analysis, the court noted that "[a] detailed description of [the] investigation results was included in an affidavit of probable cause filed to support [Brotherson's] warrantless arrest" and that "[t]he alleged conduct was also described in a probable cause statement included within the information." The court, however, "largely ignored" these sources in its analysis "because the State bargained away the

ability it had to have those allegations scrutinized during [a] preliminary hearing or trial." The court then recited the facts from the plea agreement, the factual basis recited by the State during the plea colloquy, the written statement Brotherson had provided for his PSIR, and a victim impact statement in which the victim characterized Brotherson's actions as rape. The court then reiterated the following facts that it had initially noted at sentencing:

> The psycho-sexual evaluation is no help, at all. The results are inconclusive and the detail report is inconsistent with the reported and admitted facts of the case, minimizing [Brotherson's] guilt by suggesting that he had a previous relationship with the victim, that she met him at the door partially dressed and voluntarily engaged in sexual conduct in the bed. The facts are that they had no relationship, he came in through a side door uninvited, held the victim by the throat, and clearly engaged in unwanted and nonconsensual sexual conduct.

¶14    The court then proceeded to conduct its "interest of justice" analysis, focusing on (1) the seriousness of the conduct, (2) the magnitude of the crime, and (3) Brotherson's culpability.

¶15    As to its first consideration, the court found that

> the facts that [Brotherson] has admitted describe an intrusive, harmful intent that significantly exceeded the purposes required for proof of burglary of a dwelling. He negotiated for and received a reduction in the seriousness of the offense at the time he entered his plea. He served [eight] months in jail instead of one to fifteen years in prison. His course of treatment, mandated because of the facts which indicated that

engagement in unwanted sexual behavior was at the core of this crime, was shortened and clearly influenced by his continued insistence that the facts were other than what he admitted at the time of his guilty plea. It is the conclusion of this Court that the seriousness of the conduct in this case significantly exceeded the severity of the crimes he [pled] to and, moreover, that the penalty which was imposed was substantially less than would usually be expected for those crimes.

¶16 Turning to its second consideration, the court found that the victim credibly described the impact that the incident had on her and that "[t]he harm to the victim was real, palpable, and long-lasting—perhaps permanent." The court further noted that

[b]urglary of a dwelling and an assault under circumstances where significant injury could occur might happen with far less ominous activity and results than occurred here. For example, a would-be thief/burglar might be encountered in a home . . . and then respond by flashing or threatening with a weapon to allow for escape. . . . But the circumstances here were substantially beyond and more impactful than that less serious circumstance. By comparison with the broad spectrum of home intrusion offenses . . . , it is the conclusion of the Court that this circumstance should be characterized as greater than average magnitude.

¶17 Finally, with respect to its third consideration, the court stated that although Brotherson "has substantial good will in his community of family and friends" and "completed the specific tasks imposed . . . at sentencing in unusually short order," it was "concerned that he has minimized the seriousness of the conduct that led to these convictions." The court continued:

While polygraph results are generally not admissible, it is the understanding of this Court that the process seeks to measure the confidence of the subject in his answers, not the absolute truth of the responses. This Court is satisfied that [Brotherson's] less than serious characterization of his conduct is consistent with how he views what happened that night in the victim's home. But even allowing that he believes he was not committing as serious a wrong as he admitted, it is still troubling that he doesn't understand the gravity of his conduct. By his admission, he chose to return without permission to the home, bedroom, and bed of the victim in the wee hours of the morning. He chose to initiate and complete unwanted sexual activity. He then falsely told the psycho-sexual evaluator that the victim met him at the door and invited him into the home and into the conduct. The culpability here rests with [Brotherson], not the victim. Based on the record of this case, this Court is convinced that the culpability of [Brotherson] in all of this is more significant than he acknowledges or believes it to be.

¶18    The court then concluded that based on Brotherson's admitted conduct, the impact that it had upon the victim, and the "unwanted sexual advances within the sanctity of the home of the victim," "the interests of justice . . . would not be served by reduction" of Brotherson's offenses.

¶19    Brotherson appeals.


ISSUES AND STANDARDS OF REVIEW

¶20    Brotherson asserts that the district court erred when it declined to reduce the level of his convictions. "We review a trial court's denial of a motion to reduce the degree of a conviction

for abuse of discretion." *State v. Salt*, 2015 UT App 72, ¶ 9, 347 P.3d 414. "Under this standard, we will affirm the court's decision absent a showing that it failed to consider all legally relevant factors, or if no reasonable person would take the view it adopted." *State v. Cochran*, 2019 UT App 92, ¶ 7, 443 P.3d 1269 (quotation simplified).

¶21    In response to the position the State took in its brief on appeal, Brotherson argued in his reply brief that the State had breached the plea agreement by "now revers[ing] its position and argu[ing] that the court should not have reduced the level of the offenses as [the State] had agreed." We invited and received supplemental briefing on this question. "The enforceability of a plea agreement presents a question of law" that we consider de novo. *State v. Francis*, 2017 UT 49, ¶ 8, 424 P.3d 156.

## ANALYSIS

### I. 402 Reduction

¶22    Under Utah Code section 76-3-402, a district court "may enter a judgment of conviction for a lower degree of offense," or two degrees if agreed to by the prosecutor, if after successful completion of probation the court finds the requested reduction "is in the interest of justice."[2] Utah Code Ann. § 76-3-402(3)–(4)

---

2. The district court relied on *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, when it determined that reductions of Brotherson's convictions were not in the interest of justice. *See id.* ¶ 41. But "[n]o Utah appellate court has . . . required a *LeBeau*-style analysis in deciding a charge-reduction motion brought under Utah Code section 76-3-402." *State v. Cochran*, 2019 UT App 92, ¶ 9 n.4, 443 P.3d 1269. We need not consider the propriety of the district court's *LeBeau*-style analysis in this case, because we can readily affirm its ruling that the requested reductions were not in the interest of justice under Utah Code section 76-3-402. We

(continued…)

(LexisNexis 2017). Such a decision "is one of judgment and discretion." *State v. Salt*, 2015 UT App 72, ¶ 26, 347 P.3d 414.

¶23 Brotherson's challenge to the district court's ruling focuses on a variety of individual facts and statements the court made that Brotherson argues were incorrect or mischaracterized. In Brotherson's view, examples include the court's consideration of irrelevant aggravating facts not admitted to by Brotherson that went beyond the factual basis found in his plea agreement; the court's "acting as if Brotherson had been convicted of rape"; the court's disregard of the polygraph results and the related opinion of Brotherson's psychologist; and the court's failure to properly consider Brotherson's rehabilitative potential.[3] Brotherson further assails the court's ruling with reference to other perceived errors, which we do not consider material and thus decline to address further. As stated, in deferring to the broad discretion of the district court in such matters, we take something of a thirty-thousand-foot view, which ultimately helps us determine if the district court's conclusion is one that no

---

(…continued)
can do so given the court's extensive factual findings and lengthy analysis, which allow us to determine that under the statute, even ignoring the court's reliance on *LeBeau*, the court did not exceed its discretion.

3. In his reply brief, Brotherson argues that the State's counter arguments as to why the district court's ruling should be affirmed "are unpreserved issues" because the State made no such arguments in the district court. But because we may affirm a district court's ruling "if it is sustainable on any legal ground or theory apparent on the record," even when it "was not raised in the lower court, and was not considered or passed on by the lower court," *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quotation simplified), the preservation requirements ordinarily do not apply to appellees on appeal.

reasonable person would reach. *See State v. Cochran*, 2019 UT App 92, ¶ 7, 443 P.3d 1269.

¶24 With that perspective in mind, we address Brotherson's main concern, which is his contention that although he pled guilty to burglary and aggravated assault, the district court acted throughout its entire 402 reduction ruling "as if [he] had been convicted of rape," thereby exceeding its discretion. We disagree with Brotherson's characterization of the district court's ruling. The court's actual analysis does not treat him as having committed rape, even though it referenced the allegations set forth in the probable cause statement of the information and recited the sexual abuse allegations made by the State at the plea colloquy and those included in the victim's statement. In its ruling, the court provided facts from the probable cause statement as background and did not rely on them in reaching its decision. Rather, the court explicitly stated that it "largely ignored" "[t]he alleged conduct . . . described in [the] probable cause statement included within the information" that characterized Brotherson's actions as rape. And although the court recited the statements the State made at the plea colloquy and the victim's statement that included those same rape allegations, these were not central to the court's analysis.[4]

---

4. Ultimately, an "interest of justice" analysis calls for a wide examination of the facts and the individual, looking at the big picture. And insofar as the district court may have gleaned some information from the record suggesting that Brotherson's conduct was more serious than he pled to, nothing in adjudicating the interest of justice requires the court to turn a blind eye on reliable evidence in the record that describes the defendant's conduct. Had the court solely or even primarily relied on these two sources, which were not part of the plea agreement, we likely would have reservations about the court's decision. But the court did not do so, and it was not an abuse of discretion for it to take into account reliable statements from the

(continued…)

¶25    For example, the court stated, with our emphasis, that "the facts . . . indicated that engagement in *unwanted sexual behavior*[5] was at the core of this crime." And the court found that the magnitude of the crime was great because there was an "unwanted intrusion, not just into the home but into the bedroom of the victim, coupled with an assault"—a characterization entirely consistent with the crimes of burglary and aggravated assault to which Brotherson pled guilty. When analyzing Brotherson's culpability, the court disregarded the results of his polygraph exam not because the results suggested that he did not force himself on the victim, but because of Brotherson's "less than serious characterization of his conduct" during the night in question. Notwithstanding his polygraph

---

(…continued)
State, especially because there is no indication that Brotherson objected at the plea colloquy to those statements or to those from the victim. Significantly, the court did not unduly rely on these two sources in making its decision.

5. Not all sexual crimes amount to rape, as there are many other sexual crimes that are considered less serious in nature and are punished accordingly. *Compare* Utah Code Ann. § 76-5-402(3) (LexisNexis 2017) (providing that rape is a first-degree felony), *with id.* § 76-9-702.1(3) (Supp. 2019) (providing that sexual battery is a class A misdemeanor); *id.* § 76-5-404(2) (providing that forcible sexual abuse may be punished as a second-degree felony if no serious bodily injury was done to the victim); *id.* § 76-5-412(2), (4) (providing that custodial sexual misconduct may be punished as anything from a class A misdemeanor up to a second-degree felony); *and id.* § 76-5-401(3) (stating that unlawful sexual activity with a minor may be punished as either a class A or B misdemeanor, or a third-degree felony, depending on the circumstances). Thus, by referencing unwanted sexual behavior, the court was not necessarily equating Brotherson's actions to rape.

exam narrative, "[b]y his own admission, [Brotherson] chose to return without permission to the home, bedroom, and bed of the victim in the wee hours of the morning . . . to initiate and complete unwanted sexual activity." The court also disregarded the psychosexual evaluation, again not because of its beliefs that Brotherson raped the victim and that the evaluator was wrong, but because Brotherson "falsely told the . . . evaluator that the victim met him at the door and invited him into the home and into the conduct," which was not what he admitted to in his plea statement. The court's analysis did not hinge on the rape allegations but on the conduct Brotherson admitted to and his attempts to minimize that conduct. It is therefore understandable that the court would be unfavorably impressed by what it perceived as Brotherson's attempts to shift the blame to the victim.

¶26 Accordingly, the court's analysis focused on the "unwanted" entry into the victim's home and the improper sexual behavior of Brotherson—not on an unwarranted conclusion that he raped the victim. Brotherson has not shown that the court abused its discretion in directing its focus that way. On the contrary, the court correctly summarized and recited the key facts from the evidence properly before it, the majority of which came from the admitted factual basis in the plea agreement.

¶27 The court also took into account facts favorable to Brotherson. It noted that it had received various letters from current and former employers and friends, all of whom attested to Brotherson's good character, and stated that Brotherson "has substantial good will in his community of family and friends." The court additionally found that Brotherson "completed the specific tasks imposed by this Court at sentencing in unusually short order" and that "[h]e is able to be employed and appears to be a good parent, spouse, and friend to those around him." But the court found that these factors did not outweigh its "concern[] that he has minimized the seriousness of the conduct that led to [his] convictions."

¶28 Ultimately, the district court analyzed the factors in favor of Brotherson and balanced them against the severity of the crime (unwanted sexual behavior that came after Brotherson intruded upon the sanctity of the victim's home in the middle of the night), the impact on the victim, Brotherson's periodic attempts to minimize his behavior, and his failure to take responsibility for it. Having done so, the court concluded that it was not in the interest of justice to reduce Brotherson's convictions. Brotherson does not point to any additional factor the district court should have considered but did not. Instead, Brotherson takes issue with how the district court viewed the circumstances of this case. But this decision, "[b]y its nature, . . . is one of judgment and discretion." *See State v. Salt*, 2015 UT App 72, ¶ 26, 347 P.3d 414. Given the court's sound and thorough analysis, we cannot overturn its ruling on the rationale that "no reasonable person would [have] take[n] the view it adopted."[6]

---

6. We note that in reviewing a district court's ruling for an abuse of discretion, our deference is substantial, and the mere fact that one or more of us might have ruled the other way had we been in the district court's position is largely irrelevant. *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶¶ 21–24, 361 P.3d 703 (Orme, J., and Toomey, J., concurring) (stating that "standards of review really do matter" and appellate courts will affirm a district court's discretionary ruling so long as it considered "all the relevant factors" and "explained the basis for [its] decision"). The fact that the district court was able to have the defendant before it, judge his demeanor, see his body language, and evaluate his level of sincerity gives the district court a substantial advantage over an appellate court in making an "interest of justice" determination. In this case, it might well have been expected that the court would grant Brotherson's requested reductions, given his satisfactory compliance with the terms of his probation and the State's stipulation, and had the court denied the request without any explanation, we very well may have reversed. But where the court was able to observe Brotherson in person on multiple

(continued…)

*See State v. Cochran*, 2019 UT App 92, ¶ 7, 443 P.3d 1269 (quotation simplified). *See also id.* ¶ 11 ("A court that considers all the circumstances before making a [402 reduction] decision is usually found to have acted within its discretion.").

## II. Breach of the Plea Agreement

¶29 Brotherson also asserts that "[t]he State . . . had an obligation to fulfill its promise [under the plea agreement], not just at the level of the trial court, but throughout the post-conviction process, specifically, this appeal." As a result, Brotherson contends that "[t]he State should be estopped from violating the agreement that both the State and [he] agreed to" and urges us to "strike the State's brief, or, in any event, disregard its arguments" and remand to "the sentencing court to enforce the bargain made."

¶30 "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *State v. Lindsey*, 2014 UT App 288, ¶ 16, 340 P.3d 176 (quotation simplified). "If the prosecutor breaches the agreement, then the court must afford the defendant a remedy, either by permitting the withdrawal of the plea or requiring the State to perform." *Id.* "We apply contract principles when interpreting plea agreements," *Hattrich v. State*, 2019 UT App 142, ¶ 18, 449 P.3d 929, meaning we "generally look first to the plain language" of the plea agreement, *State v. Davis*, 2011 UT App 74, ¶ 3 n.2, 272 P.3d 745. "If . . . after considering each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none, we determine that

_____

(…continued)
occasions, although he never testified before the court, and undertook a thorough and careful written analysis explaining in detail its decision to decline Brotherson's 402 reduction request, we cannot conclude that the court exceeded its discretion.

the language of the contract is unambiguous, we may interpret its terms based on the plain language" and need not go further. *State v. Terrazas*, 2014 UT App 229, ¶ 27, 336 P.3d 594 (quotation simplified). We determine that the language of the plea agreement in this case is indeed unambiguous, that the State fully complied with the agreement, and that it did not violate that agreement by opposing Brotherson's appeal.

¶31 In the plea agreement, the prosecutor agreed to recommend probation and to stipulate to a two-level reduction on the burglary conviction, and a one-level reduction on the aggravated assault conviction, upon Brotherson's successful completion of probation. This would have resulted in the reduction of each felony count to a class A misdemeanor. This language "is straightforward and explicit" and did not prohibit the State from opposing Brotherson's appeal if, the prosecutor having done as agreed, the court declined to reduce the convictions. *See Hattrich*, 2019 UT App 142, ¶ 19. The agreement the prosecutor entered into with Brotherson bound the State to stipulate to the 402 reductions upon Brotherson's successful completion of probation, and the State did exactly as required in accordance with the "clear and unambiguous language of the agreement." *See id.*

¶32 The fact that the court rejected that stipulation and came to a contrary conclusion has no bearing on the State's performance of the contract. *See State v. Stringham*, 2001 UT App 13, ¶ 14, 17 P.3d 1153 ("Even where the government and the defendant reach a plea agreement, the court is not required to accept it.") (quotation simplified). Nothing in the plea agreement limited the State's ability to take an inconsistent position on appeal and, in that setting, to defend the exercise of the district court's discretion by arguing in support of the court's interest-of-justice assessment. Atypical though it might be, if Brotherson and the State had included in the plea agreement a provision that the State would not oppose any appeal he would take in the event the district court did not grant the stipulated 402 reductions, then Brotherson would have a compelling

argument. But because no such provision exists "and the State kept [its] promise" in all respects, *see State v. Monzon*, 2016 UT App 1, ¶ 16, 365 P.3d 1234, we decline to grant Brotherson the relief he requests.

CONCLUSION

¶33 The district court did not exceed its discretion in declining to reduce Brotherson's convictions. And the State did not violate the plea agreement by defending the district court's ruling on appeal.

¶34 Affirmed.

_____